**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Ronald V. CLOUD, Defendant–Appellant.**

**No. 87–1197.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted June 15, 1988.

Decided April 5, 1989.

Howard L. Weitzman and Steve Cochran, Wyman, Bautzer, Christensen, Kuchel & Silbert, Los Angeles, Cal., for defendant-appellant.

Ross W. Nadel, Asst. U.S. Atty., San Francisco, Cal., for plaintiff-appellee.

David T. DiBiase, Michael S. Robinson, Anderson, McPharlin & Conners, Los Angeles, Cal., for the amicus curiae, Continental Ins. Co.

Before WALLACE, ALARCON and HALL, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Appellant Ronald V. Cloud appeals from his conviction following a jury trial on charges of aiding and abetting bank fraud, in violation of 18 U.S.C. §§ 2 and 1344 (1982 & Supp. IV 1986), and conspiracy to commit bank fraud, in violation of 18 U.S.C. § 371 (1982). Cloud also challenges the district court's order, entered pursuant to the Victim and Witness Protection Act of 1982, 18 U.S.C. §§ 3663–3664 (Supp. IV 1986) ("VWPA"), requiring him to pay $7.5 million restitution to the insurance company that compensated the direct victim of the bank fraud at issue in this case. We affirm both appellant's conviction and the district court order of restitution.

## I

The charges in this case stem from the January 1985 sale of the Cal–Neva Lodge, a hotel and casino complex located in the Lake Tahoe area near the California–Nevada border, by Ronald Cloud to Jon R. Perroton and Cobalt Capitol Corporation, a business association controlled by Perroton.[1]

Viewed in the light most favorable to the government, the evidence adduced at trial is as follows. Appellant Ronald Cloud is a sophisticated, 68–year old entrepreneur who has been in business for over forty years. He currently owns companies in the business of plumbing, irrigation, electric appliances, and grape cultivation. Cloud is experienced in the purchase and sale of real property and has extensive real estate holdings, valued at the time of trial at over $65 million. Appellant also has experience in the fields of banking and finance, having been the founder and chairman of Continental National Bank of Fresno.

In July of 1980, Cloud (along with his wife, Jessman Cloud)[2] purchased the Cal–Neva Lodge for $10 million from Tracinda Corporation. To finance this purchase, Cloud assumed a $4.3 million loan with First Interstate Bank and Tracinda carried another $4.8 million in the form of a second mortgage. Cloud's equity in the Lodge at the time of purchase appears to have been approximately $1.9 million. After three years of mounting operating losses, Cloud closed the Lodge and actively began seeking a new buyer in October of 1983.

Cloud's first contacts with Jon Perroton took place over a year later in December of 1984. At that time the two men met and orally agreed that Cloud would transfer the Cal–Neva Lodge to Perroton for $18 million. Cloud refused to sign any documents

---

1. On June 21, 1985, Jon Perroton was sentenced to twenty years in prison after he pleaded guilty to three counts of bank larceny, interstate transportation of moneys taken by fraud, and bank fraud, in violation of 18 U.S.C. §§ 2113(b), 2314, and 1344 (1982 & Supp. IV 1986), respectively. Perroton was prosecuted in the district court for the Northern District of California in case CR–85–0130–SC. Only the bank fraud count arose out of his purchase of the Cal–Neva Lodge.

Perroton was also ordered to pay restitution in the amount of $10 million, or a sum to be determined by the probation office.

2. Although she was nominally a party to the transactions by which her husband purchased and resold the Cal–Neva Lodge, Jessman Cloud was not charged in connection with the bank fraud at issue in this case.

with respect to the sale at that stage of their dealings.

On January 2, 1985, Perroton first met with an officer of Hibernia Bank, a vice president for corporate lending named Louis Chou, to discuss a possible loan transaction to finance his purchase of the Cal–Neva Lodge. It is undisputed that Perroton made multiple false representations during the financing negotiations and presented falsified documents, including a forged sales agreement, in order to obtain the $20 million loan that Hibernia approved on January 9, 1985. In particular, Perroton told Chou that the sale price for the Lodge was to be $27.5 million and that $7.5 million had already been paid to the Clouds outside of escrow. Perroton also falsely asserted that Sheraton Hotels would lease and operate the Cal–Neva, and would guarantee any loan Hibernia made to finance the acquisition of the Lodge.

The Cal–Neva transaction proceeded swiftly toward closing. An escrow was opened with Transamerica Title Company on January 8, 1985, by an escrow officer named Mickey Eakin. At that time, Perroton misrepresented the essential terms of the sale to Eakin, just as he had to Hibernia. Cloud met with Perroton again for approximately half an hour on January 9, 1985, at which time they agreed to adjust the sale price downward to $17,030,000. On January 11, 1985, Hibernia prepared cashier's checks totalling $20 million for deposit in escrow to be held uncashed by Eakin until the close of escrow. Although Hibernia issued these checks on January 14, 1985, the funds continued to be the bank's property until the close of escrow.

According to Eakin, Cloud spoke with her three or four times over the telephone prior to closing to inquire about the progress of the transaction and the projected closing date. Cloud met Eakin in person for the first time on January 15, 1985. On that date Perroton and his partner, Gene Cochran, drove Cloud—along with his son Steve Cloud, and attorney, James Samarco —to the San Francisco offices of Transamerica Title from the airport into which the Cloud party had flown from Fresno in Cloud's private plane. The purpose of the January 15 meeting was to sign mutual escrow instructions on the Cal–Neva Lodge sale.

Eakin testified that the five men met that day in a conference room at Transamerica, outside of her hearing, to discuss the escrow instructions that she had presented. The only evidence of what happened in the conference room came from Ronald and Steve Cloud and James Samarco. Their testimony revealed that Cloud reviewed the escrow instructions, and noticed that the sale price and down payment figures were inaccurately stated at $27.5 million and $7.5 million, respectively. Cloud also noticed that the Hibernia loan to Perroton was for $20 million, almost $3 million above what he knew to be the true sale price.

The Clouds and Samarco were clearly concerned about the false figures that appeared in the escrow instructions, especially about the tax consequences of the inflated sale price. Without explanation, Samarco asked Eakin to make certain additions to the escrow instructions, including the following language: "Seller to *net* the sum of $17,030,000 plus or minus the proration of taxes and bonds and less the first and second trust deeds." (Emphasis added). As thus amended, the escrow instructions continued to reflect a sale price of $27.5 million and a down payment of $7.5 million, figures that Perroton insisted were "for [his] purposes only."

Cloud signed the amended escrow instructions and the grant deeds to the property, and took both sets of documents home to Fresno so that his wife could sign them. Cloud returned the signed escrow instructions to Transamerica Title three days later, on January 18, 1985. Hibernia was informed on January 22, 1985 that the instructions had been signed.

The Cal–Neva Lodge escrow closed on January 23, 1985, at a meeting at Transamerica Title at which Cloud, Samarco, Perroton, and Cochran were present. Eakin disbursed the $20 million loan proceeds after receiving authorization from Hibernia. Eakin also prepared a settlement statement

for the transaction containing the same false $27.5 million sale price and $7.5 million "cash outside of escrow" figures that had been supplied by the parties. Cloud reviewed the settlement statement at the closing but did not discuss its contents. Finally, Eakin issued checks to Cloud personally for $10,067,137, and to Cloud's mortgagees for $6,971,803. Taken together these checks totalled $17,038,940—roughly the amount that Cloud's amendments to the escrow instructions indicated he was to "net" from the sales proceeds.

Hibernia claims that its losses on the Cal–Neva Lodge loan exceeded $24.5 million. The bank has recovered a substantial portion of this asserted loss from, among others, its insurer, Continental Insurance Company. Pursuant to a settlement agreement executed on July 19, 1985, Continental paid $7.5 million to resolve Hibernia's claim of loss under the terms of a "banker's blanket bond." Hibernia also recovered $1.5 million from Cloud upon an settlement agreement executed on June 18, 1987.[3]

## II

Cloud argues that the foregoing evidence is insufficient to support his convictions for aiding and abetting bank fraud and for conspiracy. There is sufficient evidence to support a conviction if, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found each of the essential elements of the crime beyond a reasonable doubt. *United States v. Penagos*, 823 F.2d 346, 347 (9th Cir.1987); *United States v. Pemberton*, 853 F.2d 730, 733 (9th Cir.1988).

## A

■ In order to obtain a conviction for bank fraud in violation of 18 U.S.C. § 1344,[4] the government must prove beyond a reasonable doubt that the defendant knowingly (1) engaged in a scheme to defraud a federally chartered or insured financial institution, or (2) participated in a scheme to obtain money under custody or control of a federally chartered or insured financial institution by means of material, false statements or representations. *See United States v. Goldblatt*, 813 F.2d 619, 624 (3d Cir.1987). For purposes of the bank fraud statute, the terms "scheme" and "artifice" are defined to include "any plan, pattern or cause [sic] of action, including false and fraudulent pretenses and misrepresentations, intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived." *Id.* It is sufficient to prove that there was a fraudulent scheme in which the defendant participated; it is not determinative that a defendant was not on hand at the "launching" of the scheme if he "came aboard" later. *See United States v. Toney*, 598 F.2d 1349, 1356 (5th Cir.1979), *cert. denied*, 444 U.S. 1033, 100 S.Ct. 706, 62 L.Ed.2d 670 (1980) (mail fraud).

Conviction as an aider and abettor requires proof beyond a reasonable doubt that the defendant willingly associated himself with a criminal venture and participated therein as something he wished to bring about. *United States v. Zemek*, 634 F.2d 1159, 1174 (9th Cir.1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981). Aiding and abetting means to assist the perpetrator of a crime. *United States v. Reese*, 775 F.2d 1066, 1072 (9th Cir.1985); *United States v. Barnett*, 667 F.2d 835, 841 (9th Cir.1982). An abettor's criminal intent may be inferred from the attendant facts and circumstances and need not be established by direct evidence.

---

**3.** Hibernia acquired the Cal–Neva Lodge and sold it for $10 million; the bank also recovered $2.2 million from Perroton, and $2.6 million from the law firm that prepared its escrow instructions for the Cal–Neva transactions. To date, then, it appears that Hibernia has recovered $23.8 million of its losses.

**4.** Section 1344(a) defines bank fraud as the knowing execution or attempted execution of "a scheme or artifice—(1) to defraud a federally chartered or insured financial institution; or (2) to obtain any of the moneys ... owned by or under the custody or control of a federally chartered or insured financial institution by means of false or fraudulent pretenses, representations, or promises...." 18 U.S.C. § 1344(a) (Supp. IV 1986).

*Reese,* 775 F.2d at 1072; *see also Zemek,* 634 F.2d at 1180.

The evidence in this case established that sometime in December of 1984 or early January of 1985, Jon Perroton "launched" a fraudulent scheme to obtain money from Hibernia Bank by means of false representations. It is uncontroverted that Perroton falsely stated the sale price and down payment for the Cal–Neva Lodge, and presented a forged sales agreement to the bank, in order to obtain funds with which to complete the Cal–Neva transaction with Cloud.

■ The issue before this court, however, is whether a rational trier of fact could conclude on the basis of all the evidence that Cloud at some point knowingly "came aboard" and participated in Perroton's bank fraud scheme. We conclude that a reasonable jury could have found that Cloud "came aboard" on January 15, 1985, at the meeting to sign the escrow instructions, if not before.

There is no question Cloud knew that the sale price was not $27.5 million, that he had not received $7.5 million outside of escrow, and that on their face the escrow instructions (as well as the settlement statement later derived from them) reflected these false figures. There is likewise no doubt that Cloud, who was a sophisticated businessman with extensive experience both in real estate transactions and in banking, knew that the escrow would not have closed and that the Hibernia funds would not have been disbursed if he had not signed the escrow instructions.

■ Cloud's primary contention regarding the sufficiency of the evidence to support his bank fraud conviction, however, is that the amendments upon which his attorney insisted served to correct or clarify any possible false representations in the escrow instructions.[5] He argues, in effect, that no reasonable jury could conclude beyond a reasonable doubt that the escrow instructions he executed were false. We disagree. Far from correcting any possible misrepresentation as to the sale price, the modification indicating that Cloud was to "net" $17 million reasonably could be construed as *confirming* that the "gross" sale price actually was the higher $27.5 million figure. The jury apparently credited testimony by Eakin that she now interprets the escrow instructions, including the modifications suggested by Samarco, as having falsely stated the sale price.

Cloud does not even attempt to argue, moreover, that the changes his attorney requested did anything to "correct" the falsely-stated figure for cash he purportedly received outside of escrow. The government was not required to prove every allegation of fraud; proof of this one material misrepresentation might have been sufficient to support Cloud's conviction. *See United States v. Halbert,* 640 F.2d 1000, 1008 (9th Cir.1981); *United States v. Beecroft,* 608 F.2d 753, 757 (9th Cir.1979).

■ We are persuaded that, viewed in a light most favorable to the government, there was sufficient evidence upon which a rational jury could conclude that Cloud affirmatively assisted in the execution of Perroton's fraudulent scheme to obtain the

---

5. In an argument that he seems to have abandoned in his reply brief, Cloud mistakenly relies on *United States v. Bales,* 813 F.2d 1289 (4th Cir.1987), for the proposition that the government must prove he knowingly made false representations directly to a bank. The bank fraud statute itself contains no such requirement. *See* 18 U.S.C. § 1344. A careful reading of its opinion, moreover, indicates that the *Bales* court imposed no such requirement. *Id.* 813 F.2d at 1293 n. 2 (conviction under 18 U.S.C. § 1014 requires proof that defendant made a false statement to a bank; conviction under 18 U.S.C. § 1344 requires proof that the defendant knowingly executed or attempted to execute a scheme or artifice to obtain money or property owned by or under the custody or control of a federally chartered or insured bank, by means of false pretenses, representations or promises).

Even assuming the government must prove that false representations were made to a bank for purposes of section 1344, there was sufficient evidence to support Cloud's conviction for aiding and abetting bank fraud. As an aider and abettor, Cloud is liable for Perroton's false representations to the bank. As noted *infra,* moreover, Cloud provided confirmation of the false statements in the escrow instructions to Eakin, an escrow officer who was acting in part as an agent for the bank, in full awareness that she would have stopped the transaction from closing if he had not done so.

Hibernia funds when he signed the mutual escrow instructions knowing that they contained materially false representations.[6]

## B

Cloud also contends that there was insufficient evidence to support his conspiracy conviction. The elements of conspiracy are: (1) an agreement to accomplish an illegal objective, (2) coupled with one or more acts in furtherance of the illegal purpose, and (3) the requisite intent necessary to commit the underlying substantive offense. *Pemberton*, 853 F.2d at 733; *United States v. Indelicato*, 800 F.2d 1482, 1483 (9th Cir.1986). The agreement need not be explicit; it may be inferred from the defendant's acts pursuant to a fraudulent scheme or from other circumstantial evidence. *United States v. Thomas*, 586 F.2d 123, 132 (9th Cir.1978); *United States v. Oropeza*, 564 F.2d 316, 321 (9th Cir.1977), *cert. denied*, 434 U.S. 1080, 98 S.Ct. 1276, 55 L.Ed.2d 788 (1978). An inference of the existence of a conspiratorial agreement may also be drawn "if there be concert of action, all the parties working together understandingly, with a single design for the accomplishment of a common purpose." *United States v. Monroe*, 552 F.2d 860, 862–63 (9th Cir.), *cert. denied*, 431 U.S. 972, 97 S.Ct. 2936, 53 L.Ed.2d 1069 (1977) (quoting *United States v. Camacho*, 528 F.2d 464, 469 (9th Cir.) (citations omitted), *cert. denied*, 425 U.S. 995, 96 S.Ct. 2208, 48 L.Ed.2d 819 (1976)).

■ A rational jury could conclude beyond a reasonable doubt from the evidence in this case that Cloud and Perroton agreed on January 15, 1985, to engage in a bank fraud scheme. Specifically, the jury reasonably could have inferred that an "agreement" was reached during the meeting at which Cloud and Perroton, along with their associates, discussed the discrepancy between the true sale price and downpayment figures and those appearing on the escrow instructions presented by Eakin. Emerging to sign the escrow instructions after resolving an admitted dispute over the accuracy of those figures is conduct from which it can be inferred that Cloud and Perroton came to a "meeting of the minds" to go forward with the Cal–Neva deal using falsified documents to memorialize the transaction.

As for the other conspiracy elements, the execution of mutual escrow instructions containing materially false representations

---

**6.** Cloud also appears to argue that: (1) even if the escrow instructions falsely stated the sales price and down payment figures, these representations were not made with the intent to deceive the bank; and (2) the bank did not rely on any material misrepresentations in the escrow instructions that were attributable to him. We reject both arguments.

To act with the "intent to defraud" means to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself. *See United States v. Peden*, 556 F.2d 278 (5th Cir.) *cert. denied*, 434 U.S. 871, 98 S.Ct. 216, 54 L.Ed.2d 150 (1977); *see also* E. Devitt & C. Blackmar, *Federal Jury Practice and Instructions* § 16.05 (3d ed. 1977). It is a well-established principle that fraudulent intent may be established by circumstantial evidence and inferences drawn from all the evidence. *See Bales*, 813 F.2d at 1294 (citing *Mitchell v. Union Pacific Railroad Co.*, 188 F.Supp. 869, 872 (S.D.Cal.1960)). There was evidence before it from which the jury could infer that Cloud made a calculated decision to sign the instructions in order to obtain his share of the loan proceeds, knowing that the bank could be deceived by materially false state-ments that appeared on the face of the instructions. For example, the jury heard evidence that Cloud decided to sell the Cal–Neva Lodge after three years of mounting operating losses, and that five years after he purchased the Lodge he sold the losing business at a before-tax profit of over $7 million.

The fact of Hibernia's reliance on false representations made by Cloud, likewise, can hardly be doubted on the facts of this case. The falsely-stated sales price and down payment were the same figures upon which Hibernia officials had relied in approving the loan to Perroton. Both Chou and Eakin testified that the escrow never would have closed, and that the Hibernia funds would not have been disbursed, if Cloud had objected to the misstated information or declined to sign the escrow instructions. At a minimum it appears that Eakin, who was acting in part as an agent of Hibernia, relied on Cloud's apparent confirmation of the false figures. A rational trier of fact could also have concluded, on the basis of Chou's and Eakin's testimony and evidence that Hibernia authorized disbursement of the loan proceeds only after Chou was notified that the escrow instructions had been signed, that Hibernia itself relied on misrepresentations attributable to Cloud.

was compelling evidence of an overt act in furtherance of the illegal objective. In light of our holding that Cloud was properly convicted of bank fraud, it is also clear that the government has established the requisite intent element for conspiracy to commit bank fraud. We conclude that there was sufficient evidence to support Cloud's conviction for conspiracy to commit bank fraud.

### III

Cloud raises several challenges to the district court's order under which he is required to pay a $500,000 fine and $7.5 million in restitution to Continental Insurance Company. First, he argues that the district court was not authorized under the Victim and Witness Protection Act to order restitution in this case because an agreement he entered into with Hibernia Bank, and another contract executed by Hibernia and Continental, fully settled all the victims' claims against him. Second, Cloud contends that the district court abused its discretion by ordering restitution, without making explicit findings of fact, in an amount that was excessive in light of his relative culpability and his net profit on the Cal–Neva Lodge transaction. Finally, Cloud contends that the restitution order and fine were illegal insofar as the district court ordered that the remaining unpaid balance of either penalty will become immediately due and payable upon his death. We will consider each of Cloud's arguments in turn.

### A

We have recently held that an insurance company is a proper beneficiary of a VWPA restitution order, under 18 U.S.C. § 3663(e)(1) (formerly 18 U.S.C. § 3579(e)(1)), where the insurer has compensated the direct victim of a criminal offense. *United States v. Youpee*, 836 F.2d 1181, 1184 (9th Cir.1988). Whether a district court may order VWPA restitution in favor of an insurance company where settlement agreements have been executed between the defendant and his direct victim, and between the direct victim and its insurer, however, is a related question of law which we will review de novo. *See United States v. Spinney*, 795 F.2d 1410, 1416 (9th Cir.1986); *see also Youpee*, 836 F.2d at 1183 (legality of sentence is reviewable de novo).

Prior to sentencing, Cloud entered into an "AGREEMENT REGARDING SETTLEMENT, RESTITUTION AND MUTUAL RELEASE" by which he agreed to pay Hibernia a total of $1.5 million to settle all its remaining claims against him. Pursuant to a "SETTLEMENT AGREEMENT AND MUTUAL RELEASE" executed with Hibernia, Continental waived *"all subrogation claims and rights* which may arise by virtue of its payment to Hibernia [of $7.5 million] pursuant to this Agreement and *all direct rights or causes of action against any party* arising out of or in any way connected with the Hibernia claim." (Emphasis added).

■ Relying primarily on language in a Fourth Circuit case, *United States v. Bruchey*, 810 F.2d 456 (4th Cir.1987), Cloud argues that the district court had no authority under the VWPA to order him to pay restitution to Continental as a result of these settlement agreements among the parties.[7] Without referring to any statu-

---

7. Cloud also argues, somewhat incredibly, that he was an intended third-party beneficiary of the agreement by which Continental waived its subrogation and direct rights to sue "any party" in connection with the Cal–Neva transaction. A third party qualifies as a beneficiary under a contract if the parties intended to benefit the third party, and the terms of the contract make that intent evident. *See Karo v. San Diego Symphony Orchestra Ass'n*, 762 F.2d 819, 821–22 (9th Cir.1985). Under California law, a third-party may enforce a contract made expressly for her benefit at any time before the parties rescind it.

Cal.Civ.Code § 1559 (West 1982). If Cloud could establish that he was an intended third-party beneficiary, perhaps he could assert the waiver provision as a defense to a civil action commenced by Continental. It does not follow, however, that he can assert any contractual rights he might have to defeat the jurisdiction of a federal court to order restitution pursuant to the VWPA. In any event, we need not resolve the parties' dispute about Cloud's third-party beneficiary claim because he failed to raise it in the district court in the first instance. *See United States v. Grewal*, 825 F.2d 220, 223 (9th

tory provision, legislative history, or case law authority, the *Bruchey* court declared that:

> Where the victim and defendant *voluntarily* execute [a promissory note or the like], the judge can certainly factor that agreement into his sentencing decision. We must observe, however, that such a voluntarily executed agreement constitutes *full and immediate restitution—* fully settling the victim's claim against the defendant. The district court, once it found that the agreement had been reached, would have no further role to play under the VWPA.

810 F.2d at 460 (emphasis in original). We believe that these statements, which clearly constitute dicta,[8] are ill-advised.

■ A faulty premise underlying Cloud's argument here is that Continental had a pre-existing "right" to receive restitution under the VWPA that it could assert or waive. The Supreme Court has held that criminal restitution is not ordered because victims have an independent legal entitlement to it but, rather, as a means of achieving penal objectives such as deterrence, rehabilitation, or retribution:

> Although restitution does resemble a judgment 'for the benefit of the victim, the context in which it is imposed undermines that conclusion. The victim has no control over the amount of restitution

Cir.1987) (citing *United States v. Whitten*, 706 F.2d 1000, 1012 (9th Cir.1983), *cert. denied* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984)).

8. The facts in *Bruchey*, briefly stated, were that the district court had compelled the defendant to sign a long-term promissory note payable to the victim as a form of restitution. Because the court failed to make specific findings of fact, and because the term of the restitution order exceeded time limits established by the VWPA, *see* 18 U.S.C. § 3663(i)(2), the Fourth Circuit vacated and remanded. *Bruchey*, 810 F.2d at 458–60. The existence of a promissory note or other settlement agreement was, therefore, not material to the court's judgment.

9. The *Kelly* Court went on to endorse the view of the judge who had decided the case before it in the bankruptcy proceedings below:

> "Unlike an obligation which arises out of a contractual, statutory or common law duty,

awarded or over the decision to award restitution. Moreover, the decision to impose restitution generally does not turn on the victim's injury, but on the penal goals of the State and the situation of the defendant.

*Kelly v. Robinson*, 479 U.S. 36, 52, 107 S.Ct. 353, 362, 93 L.Ed.2d 216 (1986).[9] *Accord United States v. Keith*, 754 F.2d 1388, 1391–92 (9th Cir.), *cert. denied*, 474 U.S. 829, 106 S.Ct. 93, 88 L.Ed.2d 76 (1985). Although the *Kelly* Court was discussing restitution ordered pursuant to a state criminal statute, the Court suggested that its holding might apply as well to VWPA restitution. *Kelly*, 479 U.S. at 53 n. 14, 107 S.Ct. at 363 n. 14.

■ Under the reasoning of *Kelly*, neither Hibernia nor Continental had an independently enforceable right to receive restitution under the VWPA. It follows that Continental did not waive either a direct or subrogation right to receive VWPA restitution when it settled Hibernia's claim of loss. We therefore conclude that, despite the existence of settlement agreements among the parties, the district court was authorized by the VWPA to order Cloud to pay restitution to the insurance company in this case.[10]

## B

We turn next to Cloud's argument that an excessive amount of restitution was or-

[the restitution] obligation is rooted in the traditional responsibility of a state to protect its citizens by enforcing its criminal statutes and to rehabilitate an offender by imposing a criminal sanction intended for that purpose." *Kelly*, 479 U.S. at 52, 107 S.Ct. at 362 (quoting *In re Pellegrino*, 42 B.R. 129 (D.Conn.1984)).

10. We do not by our holding mean to imply that Continental, or any other recipient of VWPA restitution, may obtain a double recovery for injuries resulting from the relevant criminal offense. The VWPA itself expressly forecloses this possibility. *See* 18 U.S.C. §§ 3663(e)(1) and (2). District courts can factor into their sentencing decisions the existence of settlement agreements between the defendant and any victims of the offense. In fact, when ordering restitution under the VWPA, the district court arguably is required by sections 3663(e)(1) and (2) to consider such agreements. The district court in this case was fully apprised of, and clearly considered, the existence and terms of the settlement agreements among the parties.

dered in violation of the VWPA. An order of restitution under the VWPA is part of the sentencing process. *See United States v. Richard,* 738 F.2d 1120, 1122 (10th Cir. 1984). A sentence which is within statutory limits is reviewed only for an abuse of discretion. *Youpee,* 836 F.2d at 1182.

Under the VWPA, the district court may order restitution to any positively identifiable victim of a fraudulent scheme in a definite amount that is supported by the evidence, limited by the victim's actual losses, and judicially established in a proceeding in which the defendant has the opportunity to refute the amount ordered. *United States v. Pomazi,* 851 F.2d 244, 249–50 (9th Cir.1988). In addition, the victims of the offense should be allowed to participate in the sentencing hearing so that their losses can be accurately determined. *United States v. Weir,* 861 F.2d 542, 546 (9th Cir. 1988).

■ In a section entitled "Procedure for issuing order of restitution," the VWPA specifically requires the district court to "consider" the amount of loss sustained by the victim, the financial resources and earning ability of the defendant, the financial needs of the defendant and her dependents, and other factors it deems appropriate. 18 U.S.C. § 3664(a). The VWPA also provides, however, that the imposition of a restitution order should not "unduly complicate or prolong the sentencing process." 18 U.S.C. § 3663(d).[11]

It is clear from the record in this case that the district court considered the relevant factors as required by the VWPA. At sentencing, the court commented on Cloud's financial resources and his role and culpability in the fraud. Further, the sentencing court indicated before ordering $7.5 million restitution that it had considered the following materials: the presentence report prepared by the probation office, the evidence presented at trial, letters of recommendation and materials submitted by Continental, memoranda and other documents submitted by the government and Cloud's attorney, and the arguments of the parties.[12]

■ Cloud contends, however, that the district court erred by failing to consider

---

**11.** In a footnote in his opening brief, Cloud argues that the district court was required to make clear findings of fact before entering an order of restitution, and that the failure to do so was an abuse of discretion. This court has recently held that a district court is required to make "factual determinations" under the VWPA and enter a specific order of restitution based on such facts. *United States v. Weir,* 861 F.2d 542, 546 (9th Cir.1988). After citing to a Tenth Circuit case, *United States v. Watchman,* 749 F.2d 616, 618 (10th Cir.1984), the *Weir* court sketched only a bare outline of the factfinding process that is required before imposition of a VWPA restitution order. The object, of course, is to make an order of restitution that is complete and accurate, and one that has a sound basis in fact. *Weir,* 861 F.2d at 546.

Other courts that have considered this issue have held that the district court is required to make clear and specific findings of fact before entering a restitution order. *See, e.g., Bruchey,* 810 F.2d at 459; *United States v. Palma,* 760 F.2d 475, 480 (3d Cir.1985); and *United States v. Durham,* 755 F.2d 511, 514–15 (6th Cir.1985). These courts presumably envision some sort of formal adversarial presentation of evidence, after which the court can resolve factual disputes and enter findings accordingly.

Prior to *Weir,* however, this court held that neither the VWPA nor Fed.R.Crim.P. 32 requires the district court to hold a full-blown evidentiary hearing on the issue of restitution. *United States v. Keith,* 754 F.2d 1388, 1393 (9th Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 93, 88 L.Ed.2d 76 (1985); *see also United States v. Ruffen,* 780 F.2d 1493, 1495 (9th Cir.), *cert denied,* 479 U.S. 963, 107 S.Ct. 462, 93 L.Ed.2d 407 (1986). More recently, we have held that the district court is not required to discuss on the record the factors Congress has listed in section 3664(a). *Grewal,* 825 F.2d at 223.

There is nothing in the text or legislative history of the VWPA to indicate that Congress intended the sentencing hearing to be transformed into a second trial on the issue of restitution. If anything, congressional intent appears to have been quite the contrary. *See, e.g.,* 18 U.S.C. § 3663(d). Accordingly, we decline to read *Weir,* by its uncritical and passing reference to *Watchman,* as having worked any major change in the law of this circuit. The sentencing hearing in this case was adequate, and we are satisfied by the record that the district court was well within its discretion to order $7.5 million restitution to Continental on the basis of the materials submitted and arguments presented by the parties. Formal findings of fact were not required.

**12.** An attorney representing Continental was present at the sentencing hearing but declined the court's invitation to present any argument.

his relative culpability for Continental's losses.[13] Some courts have indicated that relative degree of responsibility may be an appropriate factor to consider when imposing restitution obligations. *See e.g., United States v. Anglian,* 784 F.2d 765, 768 (6th Cir.), *cert. denied,* 479 U.S. 841, 107 S.Ct. 148, 93 L.Ed.2d 89 (1986). It is not, however, among those Congress has mandated in section 3664(a) for consideration by the district court. We reject Cloud's argument that the district court abused its discretion by failing to consider his relative culpability.[14]

■ Cloud also argues that the amount of restitution ordered was excessive because he claims to have "netted" only $2.9 million on the sale of the Cal–Neva Lodge.[15] The monetary benefit Cloud obtained from the fraudulent Cal–Neva transaction is not one of the factors the district court was required to consider under the VWPA. 18 U.S.C. § 3664(a); *see also Anglian,* 784 F.2d at 767. The district court expressly found, however, that Cloud received a net benefit in excess of $7 million on the sale. Based on the information before it (that Cloud purchased the Cal–Neva for $10 million by assuming two mortgages and initially investing approximately $1.9 million of his own funds, and paid off both mortgages to clear over $10 million at the closing of the sale five years later to Perroton), the district court clearly did not abuse its discretion in ordering Cloud to pay $7.5 million in restitution to Continental.

### C

Cloud's final contention is that the district court's order is illegal to the extent that it directs payment of any unpaid fine and restitution upon his death. Appellant argues that such a provision violates the abatement rule of *United States v. Oberlin,* 718 F.2d 894 (9th Cir.1983). *See also United States v. Patterson,* 819 F.2d 1495, 1511 n. 10 (9th Cir.1987).

Concisely stated, the rule of abatement is that "[d]eath pending appeal of a criminal conviction abates not only the appeal but all proceedings in the prosecution from its inception." *Oberlin,* 718 F.2d at 895–96. In *Oberlin,* we held that a criminal prose-

---

**13.** It may well have been that the district court actually did consider Cloud's relative culpability when it ordered him to pay Continental $7.5 million restitution. The parties had supplied the sentencing court with the "Judgment and Probation/Commitment Order" by which Jon Perroton was ordered to pay $10 million restitution. The court also knew, however, that Perroton was incarcerated, that he had a negative net worth, and that Cobalt Capital Corporation was bankrupt.

In addition to Perroton, however, Cloud maintains that the district court should have considered the relative fault of Hibernia Bank, Hibernia's lawyers, and Transamerica Title Company in setting the amount of restitution. The notion that a sentencing court should consider the comparative fault of a crime victim when ordering restitution is a strange one indeed.

A secondary theme in Cloud's "relative culpability" argument is that he was not *directly* responsible for Hibernia's (now Continental's) losses. We note that there appears to be a conflict in this circuit regarding the nexus the government must establish between the defendant's criminal conduct and the victim's losses to support a VWPA restitution order. *Compare Spinney,* 795 F.2d at 1417 (government need not prove that the defendant was *directly* responsible for the loss); with *United States v. Tyler,* 767 F.2d 1350, 1351–52 (9th Cir.1985) (restitution is proper only for losses directly resulting

from the defendant's offense). Under either test, we believe Cloud's responsibility was sufficiently direct to warrant the district court in ordering him to restore $7.5 million of the estimated $24.5 Hibernia lost as a result of the bank fraud for which both he and Perroton were convicted.

**14.** We also note our recent holding that joint and several liability for the entire loss may be imposed by the sentencing court, pursuant to an order of restitution, on each of the participants in a fraudulent scheme. *United States v. Van Cauwenberghe,* 827 F.2d 424, 435 (9th Cir.1987) (amended opinion). Subject to the statutory limitation on double recovery, both Cloud and Perroton could have been ordered to restore Continental's entire loss, plus the amount of unrecovered loss suffered by Hibernia. As in *Van Cauwenberghe,* then, it was not an abuse of discretion for the district court to order the lower amount.

**15.** Cloud's calculation takes into consideration improvements he made on the property, taxes paid on the sales proceeds, and operating losses of nearly $4 million during his ownership. The district court was fully apprised of Cloud's proposed method for computing his "profits" on the sale, and did not abuse its discretion by choosing a different formula.

cution, including both a conviction upon jury verdict and an order of forfeiture, abated *ab initio* upon the death of a defendant who committed suicide a few hours after his sentencing hearing. *Oberlin,* 718 F.2d at 896. Although the defendant had not filed a timely notice of appeal before his death, the rule of abatement was triggered because Oberlin's death prevented a final resolution of the issue of his guilt or innocence in an appeal which was an "integral part of [our] system for finally adjudicating [his] guilt or innocence." *Id.* (quoting *Griffin v. Illinois,* 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956)).

█ The rule of abatement is basically one that precludes review of a criminal conviction or sentence or other penal sanction where the accused has died during the pendency of an appeal of right. Where, as here, the defendant has not died pending resolution of his appeal, the rule of abatement is simply inapplicable.[16]

█ Cloud also argues that the provision by which the unpaid balance of the restitution payments becomes due and payable upon his death is void under 18 U.S.C. § 3565(h) (1982) (repealed effective November 1, 1987). Before it was repealed, section 3565(h) provided that an "... obligation to pay a fine or penalty ceases upon the death of the defendant...." We need not decide this issue, however, because it does not appear that Cloud presented it to the court below. *United States v. Grewal,* 825 F.2d 220, 223 (9th Cir.1987) (citing *United States v. Whitten,* 706 F.2d 1000, 1012 (9th Cir.1983), *cert. denied,* 465 U.S. 1100, 104 S.Ct. 1593, 80 L.Ed.2d 125 (1984)).

AFFIRMED.