**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Larry Joseph LEWIS, Defendant–
Appellant.**

No. 94–30214.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 9, 1995.

Decided Sept. 28, 1995.

Norman Sepenuk and Douglas A. Stringer, Portland, Oregon, for defendant-appellant.

Kent S. Robinson, Assistant United States Attorney, Portland, Oregon, for plaintiff-appellee.

Before: HALL, O'SCANNLAIN, and RYMER, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Larry Joseph Lewis appeals his jury conviction on twelve counts of bank fraud under 18 U.S.C. § 1344 and two counts of wire fraud under 18 U.S.C. § 1343. This appeal requires us to resolve a statutory construction issue of first impression—whether a state chartered, non-federally insured branch of a foreign bank is subject to the bank fraud statute. We also consider Lewis' challenge to jury instructions defining "intent to defraud" under the bank and wire fraud statutes. We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291, and we reverse.

## I.

In August, 1984 twenty-seven-year-old Larry Lewis became manager of the Portland, Oregon branch of the Hong Kong and Shanghai Bank ("HKSB"), a title he would hold until his resignation in June, 1988. Lewis, whose previous position at HKSB was limited to supervising tellers and assisting in import/export loans, had no prior experience in granting loans or in managing a bank. With his promotion came the weighty task of improving the revenues of the singularly unprofitable Portland branch.

Shortly after becoming branch manager, Lewis made a large authorized loan to Financial Reserve Group ("FRG"). He soon learned that the principals of FRG were the targets of a criminal grand jury investigation, and concluded that it was unlikely that FRG's debt would ever be repaid. Rather than reporting the bad debt to his superiors, which would have caused the branch to reflect a loss in his first full year as manager, Lewis agreed to make an unauthorized loan to Gary Diers, an FRG principal who had been exonerated in the criminal investigation. Diers agreed to use part of the $1.8 million[1] loan to pay off the FRG debt. This allowed the Portland branch to carry a profit on its books in 1985. With the remaining portion of the loan, Diers acquired a substantial amount of real estate for a development project he wished to pursue. Over the next year, Lewis made further unauthorized loans to Diers, bringing Diers' total debt to $3.6 million.

In 1987, Diers incorporated his real estate development project under the name of Thiel Creek Development Company ("Thiel Creek"). Lewis made an unauthorized $6.3 million secured loan (bank fraud Count I) to Thiel Creek, the proceeds of which were used to pay the principal and interest on the $3.6 million Diers loan and to purchase additional property for Thiel Creek's development project. At this point, it was becoming clear to Lewis that the amount necessary to fund the development project substantially exceeded Diers' projections. Because he was "in too far" to turn back, Lewis made four additional secured loans to Thiel Creek in the amount of $1.6 million (bank fraud Counts II through V) in the hope that continued funding would increase the bank's chances of recouping its money.

Counts 8 through 12 of the indictment arose out of unauthorized lines of credit and loans that Lewis was instrumental in obtaining for Pacific Corridor International, Inc. ("PCI"), a wood products broker, as well as overdrafts permitted and concealed by him.[2]

Count 8 alleged that Lewis made various false statements in a line of credit application, including underreporting PCI's bank debt, designed to induce his superiors to double PCI's line of credit. After gaining approval to increase PCI's credit limit, Lewis permitted PCI to progressively overdraw its line of credit until the company's checking account reflected an overdraft of more than $4.5 million over its authorized limit. To conceal the overdraft, Lewis made an unauthorized transfer of $5 million from a bank suspense account into PCI's checking account (Count 9). Count 10 alleged that Lewis made false statements in connection with an application submitted on behalf of PCI for a $3.4 million short term loan. Counts 11 and 12 were based on Lewis' deposit of a $5 million insufficient funds check from PCI, and the creation of computer data entries concerning the deposit which were later communicated by wire to HKSB's regional office in New York.

The remaining bank and wire fraud counts against Lewis related to unauthorized lines of credit and loans granted to Western Line Corporation ("WLC"), a wood products manufacturer. Lewis was charged with obtaining two unauthorized lines of credit for WLC by making false statements on a credit application, including underreporting WLC's bank debt and falsely representing that WLC would soon obtain a capital infusion, a portion of which would be posted as collateral. Although HKSB's approval of the loan was expressly conditioned on the capital infusion and the posting of collateral, Lewis removed these conditions from the loan documents. When one of the lines of credit came due, Lewis faxed a request to HKSB's regional office in New York for an extension of the due date, which was approved. The fax substantially underreported WLC's existing debt to the bank, and failed to disclose the fact that the collateral and capital infusion had never been received.

---

**1.** Lewis' lending authority at the time was limited to $500,000.

**2.** At trial, there was testimony that a bounced check could have a ruinous effect on a business in the wood products industry. Lewis testified that he believed that his refusal to honor a check could put the borrower out of business and subject HKSB to civil liability.

Lewis did not deny that he made unauthorized loans, that he granted credit exceeding approved limits or that he failed to obtain required collateral. In his defense, he claimed variously that he continued to extend unauthorized credit facilities to keep the borrowers from going out of business and to enable them to repay prior loans, that he relied in good faith on representations made by the companies, that certain of his misrepresentations were unintentional, and that he was acting in the best interests of HKSB. A jury convicted Lewis on all bank and wire fraud counts.[3]

## II.

Prior to the commencement of the jury trial, Lewis filed an unsuccessful motion to dismiss the bank fraud counts for lack of jurisdiction, arguing that 18 U.S.C. § 1344 did not apply to HKSB. The version of § 1344 in effect during 1987 and 1988, the time period charged in the indictment, defines bank fraud as the knowing execution or attempted execution of "a scheme or artifice ... to defraud a federally chartered or insured financial institution."[4] The essence of this case revolves around the meaning of the phrase "federally chartered ... financial institution," defined, in pertinent part, by § 1344(b)(5) as "a bank ... or other banking or financial institution organized or *operating under the laws of the United States.*" 18 U.S.C. § 1344(b)(5) (1988) (emphasis added). There is no dispute that HKSB is a foreign entity incorporated under the laws of the British Crown Colony of Hong Kong, and is

thus not organized under the laws of the United States. It is also undisputed that the Portland branch has an Oregon state charter and is neither federally chartered nor federally insured. Thus, the only question is whether the bank is operated under the laws of the United States as that term is used in § 1344(b)(5).[5]

■ Based on the "comprehensive federal regulations [applicable to HKSB] through the International Banking Act of 1978," the district court held that HKSB operates under the laws of the United States. *United States v. Lewis,* 838 F.Supp. 474, 477 (D.Or.1993). We review questions of statutory construction and questions of federal subject matter jurisdiction *de novo. United States v. Bailey,* 41 F.3d 413, 416 (9th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 2563, 132 L.Ed.2d 815 (1995); *Hellon & Assoc., Inc. v. Phoenix Resort Corp.,* 958 F.2d 295, 297 (9th Cir.1992). We disagree with the district court's conclusion that HKSB was operating under the laws of the United States within the meaning of § 1344(b)(5), and we therefore hold that Lewis' conviction on the bank fraud charges must be reversed and his sentence vacated.

■ Canons of statutory construction dictate that if the language of a statute is clear, we look no further than that language in determining the statute's meaning. *See Sullivan v. Stroop,* 496 U.S. 478, 482, 110 S.Ct. 2499, 2502–03, 110 L.Ed.2d 438 (1990); *United States v. Ron Pair Enter., Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1031, 103 L.Ed.2d 290 (1989). Particular phrases must

---

**3.** Lewis was acquitted on three charges of making false statements to a federally insured bank in violation of 18 U.S.C. § 1005 because there was insufficient proof that HKSB was a federally insured institution. The government conceded that two other counts alleging violations of § 1005 should be dismissed for failure to state an offense.

**4.** The pertinent portions of § 1344 provide that:
(a) Whoever knowingly executes, or attempts to execute, a scheme or artifice—
(1) to defraud a federally chartered or insured financial institution

. . . . .

shall be fined not more than $10,000, or imprisoned not more than five years, or both.

(b) As used in this section, the term "federally chartered or insured financial institution" means—

. . . . .

(5) a bank ... or other banking or financial institution organized or operating under the laws of the United States.
18 U.S.C. § 1344 (1988).

**5.** The version of § 1344 applicable during the time period charged in the indictment was amended in 1989. Section 1344 no longer contains the "operating under the laws of the United States" language so hotly disputed by the parties. We construe only the version of § 1344 in effect when the substantive acts occurred in 1987 and 1988.

be construed in light of the overall purpose and structure of the whole statutory scheme. *Dole v. United Steelworkers of America,* 494 U.S. 26, 35, 110 S.Ct. 929, 934, 108 L.Ed.2d 23 (1990). A court looks to legislative history only if the statute is unclear. *Blum v. Stenson,* 465 U.S. 886, 896, 104 S.Ct. 1541, 1547–48, 79 L.Ed.2d 891 (1984).

## A. Plain language

■ Based upon the "plain language" of the statute, each party offers its own reading of § 1344(b)(5), neither of which is persuasive. Lewis offers an exceedingly narrow interpretation of the bank fraud statute, contending that a bank is only "operating under the laws of the United States" if it has a federal charter. Because neither HKSB nor its Portland branch possesses a federal charter, Lewis argues, he could not be prosecuted for bank fraud. This argument, however, violates the elementary principle of statutory construction that "a statute must, if possible, be construed in such fashion that every word has some operative effect." *United States v. Nordic Village, Inc.,* 503 U.S. 30, 112 S.Ct. 1011, 117 L.Ed.2d 181 (1992). *See also Boise Cascade Corp. v. U.S.E.P.A.,* 942 F.2d 1427, 1432 (9th Cir.1991) (statutes must be interpreted "as a whole, giving effect to each word and making every effort not to interpret a provision in a manner that renders other provisions of the same statute ... superfluous.") Contrary to Lewis' argument, § 1344(b) does not define a "federally chartered" bank simply as any bank that has a federal charter. Instead, § 1344(b) has five

separate subsections, all of which are included in the definition of "federally chartered or insured financial institution." [6] Sections 1344(b)(1) through (3) describe institutions whose deposits are insured by various federal agencies. Section 1344(b)(4) explicitly refers to federal home loan banks or members of the federal home loan bank system. Section 1344(b)(5) applies to banks which, like HKSB and its Portland branch, have no federal insurance and are not members of the federal home loan bank system. That subsection defines a "federally chartered" bank not, as Lewis argues, simply as a bank that has a federal charter, but as one that is "operating under the laws of the United States." We cannot accept Lewis' "plain language" interpretation because to do so would read the "operating under the laws of the United States" language out of the statute.

In attempting to shed light on the disputed statutory language, the government reasserts the argument accepted by the district court that the phrase "operating under," read in its ordinary sense, means any bank that is subject to regulation and control by federal regulatory bodies. We cannot accept the government's "plain language" argument because it leads to a sharply anomalous result. Even purely domestic banks that have no federal deposit insurance and are not members of the Federal Reserve System would "operate under the laws of the United States" under the government's expansive reading because such banks are subject to a certain amount of federal statutory and regulatory control.[7] Both parties' plain language

---

**6.** Section 1344(b)(5) provides the following five alternative definitions of the term "federally chartered or insured financial institution":
(1) a bank with deposits insured by the Federal Deposit Insurance Corporation;
(2) an institution with accounts insured by the Federal Savings and Loan Insurance Corporation;
(3) a credit union with accounts insured by the National Credit Union Administration Board;
(4) a Federal home loan bank or a member ... of the Federal home loan bank system; or
(5) a bank, banking association, land bank, intermediate credit bank, bank for cooperatives, production credit association, land bank association, mortgage association, trust company, savings bank, or other banking or financial institution organized or operating under the laws of the United States.

**7.** The Bank Holding Company Act of 1956 is just one example of such control. Under that Act, no bank, regardless of its nature, may be acquired by a bank holding company without the prior approval of the Board of Governors of the Federal Reserve System. 12 U.S.C. §§ 1841 *et seq. See also* 12 U.S.C. § 4001 *et seq.* (Expedited Funds Availability Act provides that all depository institutions must comply with a prescribed schedule for making deposited funds available for withdrawal); 15 U.S.C. § 1601 *et seq.* (Truth-in-Lending Act requires disclosures of certain loan terms using uniform terminology); 12 U.S.C. § 2901 *et seq.* (Community Reinvestment Act encourages lending within an institution's own community and discourages discrimination against lending to certain minority neighborhoods); 12 U.S.C. § 2601 *et seq.* (Real Estate Settlement Procedures Act provides certain con-

arguments thus fail. To resolve the ambiguity inherent in the "operating under" language, we must therefore examine the relevant legislative history.

### B. Legislative history

Before the enactment of § 1344 as part of the Comprehensive Crime Control Act of 1984, no federal provision specifically criminalized bank fraud. Section 1344 was Congress' response to the government's increasing inability to reach crimes against financial institutions under other criminal banking provisions, such as the false statement statute, 18 U.S.C. § 1014, and the mail and wire fraud statutes, 18 U.S.C. §§ 1341 and 1343, due to the Supreme Court's increasingly narrow construction of those provisions. S.Rep. 98–225, 98th Cong., 1st Sess. 377 (1984), reprinted in 1984 U.S.C.C.A.N. 3517, 3517–18.

The sparse legislative history surrounding § 1344 contains no clarifying discussion of the phrase "operating under the laws of the United States." A narrow reading of the phrase finds some support, however, in Congress' selection of a jurisdictional basis for the federal bank fraud provision. Section 1344 is modeled directly on the mail and wire fraud statutes. However, unlike §§ 1341 and 1343, federal jurisdiction is predicated not upon the use of the mails or wire communications in interstate commerce without regard to the victim bank's status, but upon the "strong Federal interest" in the financial integrity of a "federally controlled or insured institution," defined as a "federally chartered or insured financial institution," which is in turn defined as a bank "operating under the

laws of the United States." Id. at 3519. Although the legislative history does not answer the ultimate question whether a non-federally insured, state chartered branch of a foreign bank is "federally controlled" for purposes of the bank fraud statute, the jurisdictional distinction between the mail and wire fraud statutes on the one hand and § 1344 on the other suggests that the latter's reach is more limited than that of its sister statutes.[8]

### C. The International Banking Act of 1978

The International Banking Act of 1978 ("IBA"), 12 U.S.C. §§ 3101–3108 (1988), as it existed during the relevant time period of 1987 and 1988, and its legislative history provide further support for a narrow reading of § 1344(b)(5).[9] The IBA, which is the principal federal law governing foreign bank operations, was enacted to eliminate various "competitive advantages" foreign banks operating in this country enjoyed over federally and state chartered domestic banks. S.Rep. 95–1073, 95th Cong., 1st Sess. 6 (1978), reprinted in 1978 U.S.C.C.A.N. 1421, 1422, 1426. Specifically, unlike their domestic counterparts, branches of foreign banks, because not subject to the strictures of the McFadden Act and Bank Holding Company Act, were permitted the unfair advantage of establishing full service banking facilities capable of accepting deposits in more than one state. Id. at 1427–28.

To establish competitive equality between foreign and domestic banks, the IBA limits the domestic deposit-taking activities of a foreign bank to its designated "home" state,

---

sumer safeguards in connection with home mortgage settlements).

**8.** We note that the 1989 amendments to 18 U.S.C. § 1344 substituted references to "federally chartered or insured financial institution" with "financial institution." The term "financial institution" was elsewhere expressly defined to include, among other things, "[a] branch or agency of a foreign bank." 18 U.S.C. § 20. However, we do not take this amendment necessarily to suggest that, prior to 1989, the statute did not apply to branches of foreign banks. "[A]n amendment to a statute does not necessarily indicate that the unamended statute meant the opposite." Hawkins v. United States, 30 F.3d 1077, 1082 (9th Cir.1994).

**9.** The IBA, passed six years before the enactment of § 1344, contains language similar to § 1344(b)(5)'s disputed text and is, therefore, pertinent to our construction of the bank fraud statute. See Hellon & Associates, Inc. v. Phoenix Resort Corp., 958 F.2d 295, 297 (9th Cir.1992) (statutes should be harmonized to the extent possible); id. (" 'Congress must be presumed to have known of its former legislation and to have passed ... new laws in view of the provisions of the legislation already enacted.' ") (quoting Owner–Operators Indep. Drivers Ass'n of Am., Inc. v. Skinner, 931 F.2d 582, 586 (9th Cir.1991)).

12 U.S.C. § 3103(a) (1988), thus "provid[ing] foreign banks with 'national treatment' under which 'foreign enterprises ... are treated as competitive equals with their domestic counterparts.'" *Conference of State Bank Supervisors v. Conover,* 715 F.2d 604, 606 (D.C.Cir. 1983) (*quoting* 1978 U.S.C.C.A.N. 1421, 1422), *cert. denied* 466 U.S. 927, 104 S.Ct. 1708, 80 L.Ed.2d 181 (1984). Until the enactment of the IBA, foreign banks operating branches in the United States did so only under state authority. 1978 U.S.C.C.A.N. 1421, 1426. Under the IBA, a branch of a foreign bank must choose between state or federal treatment and can expect, thereafter, to be subject to the same restrictions as a similarly situated domestic bank. *See* 12 U.S.C. § 3102(a) (1988) (subject to approval of the Comptroller of the Currency, a foreign bank may establish a federal branch in any state in which it is not operating a branch under state law, and in which the establishment of such branch is not prohibited by state law); *see also* 1978 U.S.C.C.A.N. 1421, 1426 (discussing "State–Federal option").

Because HKSB elected an Oregon state charter for its Portland branch, that branch was a "state branch," defined under the IBA as "a branch of a foreign bank *established and operating under the laws of any State.*" 12 U.S.C. § 3101(12) (1988) (emphasis added). By contrast, the IBA defines a "federal branch" as one "established and operating under section 3102." 12 U.S.C. § 3101(6) (1988). Section 3102 provides, in turn, that a federal branch of a foreign bank is "subject to such rules, regulations, and orders as the Comptroller [of the Currency] considers appropriate," and that such a branch will, with certain exceptions, receive "the same rights and privileges as a national bank at the same location" under the National Bank Act. 18 U.S.C. § 3102(b) (1988).

The government recognizes that § 3101(12) appears linguistically to exclude HKSB's Portland branch from the effect of § 1344(b)(5)'s "operating under the laws of the United States" language. It contends, however, that the regulatory control exercised over state branches of foreign banks through the IBA is sufficient to bring the Portland branch within the bank fraud statute's purview. The government finds the regulatory authority of the Federal Reserve Board over such branches particularly persuasive, contending that the Federal Reserve exercises the same authority over state branches as it does over federally chartered branches. In actuality, the IBA's legislative history makes clear that the Federal Reserve's authority over a state branch of a foreign bank is secondary to the state's oversight. In sharp contrast, federal branches and federally insured state branches receive their principal oversight from federal sources—i.e., from the Comptroller of the Currency and the FDIC, respectively. As the legislative history of the IBA states:

> In order to ensure adequate supervision of foreign bank operations within the present Federal–State regulatory framework, the bill provides that the Comptroller, the FDIC, and the States will have primary examining authority over such operations within their jurisdiction. The committee amended the House bill to provide the Federal Reserve Board with residual examining authority over all banking operations of foreign banks.... Thus, Federal branches and agencies will be subject to examination by the Comptroller, federally insured State branches will be examined by the State agencies and by the FDIC, and *non-federally insured State branches ... will be examined by the appropriate State authorities or, if not so examined, by the Federal Reserve.*

> · · · · ·

> The legislation gives the Federal Reserve *residual examination and supervisory authority over the domestic operations of foreign banks....* Branches ... of foreign banks principally fall within the regulatory purview of State authorities.

1978 U.S.C.C.A.N. 1421, 1433, 1445 (emphasis added).

■ We cannot agree with the district court's view that the federal regulations applicable through the IBA are "significant," 838 F.Supp. at 477, enough to cause the Portland branch to fall within the bank fraud statute's definition of a "federally chartered" bank. The plain language of the IBA's text, which distinguishes between state and feder-

al branches of foreign banks, and the IBA's legislative history, make clear that a state branch is "organized and operating under the laws of a state" even though it is subject to the Federal Reserve's secondary regulatory authority and other federal regulation under the IBA.[10] We hold that HKSB's Portland branch was not "operating under the laws of the United States" within the meaning of § 1344(b)(5), and that the district court therefore erred in denying Lewis' motion to dismiss the bank fraud charges for lack of jurisdiction.[11] By extension, we hold also that the district court misstated an element of the crime of bank fraud when it erroneously instructed the jury that a bank is "operating under the laws of the United States" if it is "subject to regulation, examination and supervision by the Federal Government" including regulation by the Federal Reserve.

For the foregoing reasons, Lewis' conviction on the bank fraud counts is reversed.

### III.

■ Lewis next argues that the district court's instruction on "intent to defraud," an element essential to both the bank and wire fraud counts, was erroneous. Where, as here, an appellant claims that the trial court misstated the elements of a statutory crime, we conduct a *de novo* review. *United States v. Perez,* 989 F.2d 1111, 1114 (9th Cir.1993).

The challenged instruction read as follows:

In order to establish the third element of the crime of bank [and wire] fraud, it is necessary for the Government to prove that defendant Lewis acted with the intent to defraud.

To act with the "intent to defraud" means to act with a specific *intent to deceive the Hong Kong and Shanghai Bank into making lending decisions which could cause a loss to the bank. . . .*

Lewis argues that the district court erred by giving an incorrect and confusing definition of "intent to defraud" by equating that element with mere deceit and thereby shifting the jury's focus from an intent to harm. He contends that the "intent to defraud" instruction was further diluted by referring to lending decisions "which could cause a loss to the Bank," in that every lending decision is one that could cause a loss, and that the court's error was exacerbated by its refusal to give his own proposed instruction taken from *United States v. Cloud,* 872 F.2d 846 (9th Cir.1989). We express no opinion on these arguments, as we conclude that the instruction that was given impermissibly allowed the jury to find the requisite intent to defraud based on depriving the bank of a right to make sound lending decisions. For this reason, we must reverse Lewis' conviction on the wire fraud counts.

The district court's intent instruction is closely analogous to the one we approved in *United States v. Green,* 745 F.2d 1205 (9th Cir.), *cert. denied,* 474 U.S. 925, 106 S.Ct. 259, 88 L.Ed.2d 266 (1985). There the jury was instructed, essentially, that intent to defraud was proven if the defendant intended to deprive his victim of its right to make an informed business decision. *Id.* at 1209. In the present case, the jury was invited to convict on a finding that Lewis, by deceiving HKSB into making risky loans, intended to deprive it of its right to make an informed lending decision. We must decide whether the specific intent instruction presented the jury with a legally inadequate theory. *See United States v. Barona,* 56 F.3d 1087, 1097 (9th Cir.1995) (where jury is presented with legally insufficient theory, as opposed to factually insufficient theory, conviction must be vacated).

---

10. Under the IBA, foreign banks with state branches are also subject to other federal authority including, for example, the Bank Holding Company Act of 1956, 12 U.S.C. § 1841 *et seq.,* and federal anti-discrimination laws. *See* 12 U.S.C. §§ 3106 and 3106a. By the IBA's own terms, the applicability of such federal regulation has no effect on the "state branch" status of a state-chartered branch of a foreign bank.

11. Even if we could agree that the federal regulation over the Portland branch provides some support for the government's position, this view would, at best, render the language of the bank fraud statute ambiguous. Faced with a statute susceptible to two rational interpretations, the rule of lenity requires that we choose the harsher interpretation "only when Congress has spoken in clear and definite language." *McNally v. United States,* 483 U.S. 350, 359–60, 107 S.Ct. 2875, 2881–82, 97 L.Ed.2d 292 (1987).

■ Prior to the Supreme Court's decision in *McNally v. United States,* several courts of appeals had held that "schemes to defraud include those designed to deprive individuals, the people, or the government of intangible rights, such as the right to have public officials perform their duties honestly." *McNally v. United States,* 483 U.S. 350, 358, 107 S.Ct. 2875, 2881, 97 L.Ed.2d 292 (1987), *overruled by statute,* 18 U.S.C. § 1346 (1988). *McNally* read the mail fraud statute [12] as "limited in scope to the protection of property rights." [13] *Id.* at 360, 107 S.Ct. at 2882–83. According to *McNally,* "the words 'to defraud' ... 'usually signify the deprivation of something of value by trick, deceit, chicane or overreaching.'" *Id.* at 358, 107 S.Ct. at 2881 (quoting *Hammerschmidt v. United States,* 265 U.S. 182, 188, 44 S.Ct. 511, 512, 68 L.Ed. 968 (1924)).

■ As a general matter, we have approved instructions defining "intent to defraud" as "the specific intent to deceive, *ordinarily* for the purpose of either causing some financial loss to another or bringing about some financial gain to one's self." *United States v. Simas,* 937 F.2d 459, 462–63 (9th Cir.1991) (emphasis in original).[14] More recently, we have recognized that the right to make an informed business decision is not the kind of intangible right protected under the wire fraud statute. *See United States v. Bruchhausen,* 977 F.2d 464, 469 (9th Cir. 1992) (Fernandez, J., concurring) ("I ... agree that the right of manufacturers to

make decisions based on truthful information is far too ethereal to be a property right for the purposes of the wire fraud statute."). Because the challenged instruction focused on whether Lewis deprived HKSB of its intangible right to make an informed lending decision, we conclude that the instruction violated *McNally.* This error alone requires reversal. *See Barona,* 56 F.3d at 1097. "Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question ... fails to come within the statutory definition of the crime." *Id.* When jurors "have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error." *Id.*

The government argues that the challenged instruction is acceptable when read in conjunction with two other instructions because, so read, the jury was adequately apprised that Lewis must have intended to deprive the bank of its property or money. The district court instructed that Lewis could be convicted of bank and wire fraud either (1) upon a showing that he knowingly carried out a scheme to defraud HKSB or (2) that he schemed to obtain HKSB's money or credits by means of false pretenses, representations or promises. The court defined a "scheme to defraud" as "a plan to affect the property rights of the bank by dishonest means, [which] usually involves *depriving the bank*

12. Cases interpreting the mail fraud statute are relevant in construing the wire and bank fraud statutes. *See United States v. Mason,* 902 F.2d 1434, 1441 (9th Cir.1990); *United States v. Bonallo,* 858 F.2d 1427, 1432–33 (9th Cir.1988).

13. In November 1988, Congress overruled *McNally* by adding 18 U.S.C. § 1346, which provides: "For the purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme or artifice to deprive another of the intangible right of honest services." Because § 1346 does not apply retroactively to Lewis' offenses, all of which occurred prior to the enactment of § 1346, *McNally* provides the rule of decision in this case. *See United States v. Dischner,* 974 F.2d 1502, 1518 n. 16 (9th Cir.1992), *cert. denied,* — U.S. —, 113 S.Ct. 1290, 122 L.Ed.2d 682 (1993).

14. *See also United States v. Thomas,* 32 F.3d 418, 419 (9th Cir.1994) (in mail fraud prosecution, defendant "must have intended to deprive his

victims of money or property"); *United States v. Utz,* 886 F.2d 1148, 1151 (9th Cir.1989), *cert. denied,* 497 U.S. 1005, 110 S.Ct. 3242, 111 L.Ed.2d 753 (1990) ("A scheme to defraud, whether successful or not, remains within the purview of section 1341 as long as the jury was required to find an 'intent to obtain money or property from the victim of the deceit.'"); *United States v. Lew,* 875 F.2d 219, 221 (9th Cir.1989) (in mail fraud prosecution, intent of scheme must be to obtain money or property from the one who is deceived); *United States v. Cloud,* 872 F.2d 846, 852 n. 6 (9th Cir.), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1989) ("intent to defraud" means "to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself.").

*of something of value by trick or deceit."* "A scheme to obtain money or credit by false pretenses, representations or promises" was defined as "a plan to *deprive the bank of its money or credit* by making false statements or representations. The false statements must be important enough to the plan that they would reasonably influence the bank to part with money or property."

■ While these instructions clearly implicate HKSB's property interests, we conclude that the erroneous instruction requires reversal because "[w]here two instructions conflict, a reviewing court cannot presume that the jury followed the correct one." *United States v. Stein*, 37 F.3d 1407, 1410 (9th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1170, 130 L.Ed.2d 1124 (1995).[15] For the foregoing reasons, we reverse Lewis' conviction on the wire fraud counts.[16]

**REVERSED.**

---

**15.** The government's final argument is that any error in the intent instruction was harmless because the jury clearly concluded that Lewis submitted false loan applications, and any bank manager who submits such an application must have been acting with the intent to defraud. This argument fails to recognize that the errant instruction left the jury the option of relying upon a legally inadequate theory. In such a case, the conviction must be vacated and the case retried as to that charge. *See Barona,* 56 F.3d at 1098.

**16.** Because we reverse on all counts, we do not reach Lewis' remaining arguments.