**UNITED STATES of America,**

v.

**John FLYNN.**

**Crim. No. 83–00028–01–SD.**

United States District Court,
D. New Hampshire.

Feb. 24, 1994.

Arnold Huftalen, Asst. U.S. Atty., Concord, NH, for plaintiff.

Robert Kirby, Concord, NH, for defendant.

## MEMORANDUM OPINION

DEVINE, Senior District Judge.

The probationer, John Flynn, has been charged with violation of his probation. The court has reviewed the testimony, exhibits, and legal memoranda provided during and after the hearing held with respect to these charges.

### Background

Flynn appeared with counsel before this court on June 27, 1983, waived indictment, and pled guilty to charges of conspiracy and mail fraud.[1]

On August 8, 1983, he was sentenced to five years' imprisonment and a consecutive five-year suspended sentence, to be followed by five years of probation. Flynn's probation began on August 28, 1988.

Transfer of Flynn's supervision to the District of Maine, to which he had moved in January 1992, was completed in October 1992. Flynn was placed, and remains, under the supervision of United States Probation Officer (USPO) Vincent Frost. According to Thomas K. Tarr, Chief USPO for the District of New Hampshire, soon thereafter information began to surface that the probationer had been involved in a number of fraudulent activities since arriving in Maine. USPO Frost conducted an investigation which resulted in the filing of a Petition on Probation and Supervised Release to revoke Flynn's probation.

### Discussion

#### 1. The Requirements of Rule 32.1(a)(2)

Pursuant to Rule 32.1(a)(2), Fed.R.Crim. P., a probationer subject to a revocation hearing

shall be given

(A) written notice of the alleged violation;

(B) disclosure of the evidence against the person;

(C) an opportunity to appear and to present evidence in the person's own behalf;

(D) the opportunity to question adverse witnesses; and

(E) notice of the person's right to be represented by counsel.

During the hearing on the instant matter, the court found no breach of the requirements of Rule 32.1(a)(2), nor did probationer register any unresolved objections thereto. However, as to the requirement of written notice, probationer contended that the Petition on Probation and Supervised Release, filed on August 16, 1993, constituted the only valid notice of the alleged violations. The court disagrees.

■ A probationer subject to a revocation hearing is entitled to written notice of the alleged violations. *Gagnon v. Scarpelli,* 411 U.S. 778, 786, 93 S.Ct. 1756, 1762, 36 L.Ed.2d 656 (1973); Rule 32.1, Fed.R.Crim.P. "[T]he written notice required by *Gagnon* must be given before the final hearing to satisfy the requirements of due process." *United States v. Davila,* 573 F.2d 986 (7th Cir.1978).

■ Accordingly, and having reviewed the documents at issue, the court finds and rules that Flynn received adequate written notice of his alleged violations in the form of the Petition on Probation and Supervised Release, filed on August 16, 1993, and the Government's Brief re: Probation Revocation Hearing, filed prior to commencement of the hearing on February 2, 1994.

#### 2. Standard of Review

■ In considering whether probation should be revoked, the court must (1) determine whether the probationer has violated one of the conditions of probation, and (2) determine whether such violation warrants revocation in light of its nature and the histo-

---

1. These charges included conspiracy in violation of 18 U.S.C. § 371, mail fraud in violation of 18 U.S.C. § 1341, and criminal liability as a princi-pal under 18 U.S.C. § 2 as to the mail fraud charges.

ry of the probationer. *United States v. Nolan*, 932 F.2d 1005, 1006 (1st Cir.1991); *United States v. Czajak*, 909 F.2d 20, 22 (1st Cir.1990); *United States v. Morin*, 889 F.2d 328, 332 (1st Cir.1989). The proof required is merely that the evidence and facts be such as reasonably to satisfy the court that the probationer's conduct has not been as required by the conditions of probation. *United States v. Czajak, supra,* 909 F.2d at 22. There is

> no constitutional requirement that, in a probation revocation hearing predicated on alleged violation of a criminal law, a probationer be granted a jury trial, or that commission of the crime be proven beyond a reasonable doubt.... This is because "[r]evocation deprives an individual, not of the absolute liberty to which every citizen is entitled, but only of the conditional liberty properly dependent on observance of special [probation] restrictions." *Morrissey v. Brewer*, 408 U.S. 471, 480 [92 S.Ct. 2593, 2600, 33 L.Ed.2d 484] (1972). It is, in effect, more a re-sentencing hearing than a taking of rights. *United States v. Bazzano*, 712 F.2d 826, 833 (3d Cir.1983), *cert. denied, Mollica v. United States*, 465 U.S. 1078 [104 S.Ct. 1439, 79 L.Ed.2d 760] (1984).

*Id.* at 24 (footnote omitted). The court notes that the findings of fact made herein are based upon a preponderance of the evidence.

### 3. *Alleged Violations*

■ Condition No. 1 of Flynn's probation requires, inter alia, that he "refrain from violation of any law (federal state or local)." Government Exhibit 41.

#### a. *Forgery and Theft by Deception: Mayville's Tavern*

Paragraph 2 of the Petition states,

> While a shareholder and general manager at Mayville Tavern from April 17, 1992 until May 1993, the probationer, who was not a signatory of the corporate bank accounts, forged both Alexander MacGregor and Phillippe Sée's name, both duly authorized signatories, to various checks. Both MacGregor and Sée and every other share-

holder will testify that they never gave Flynn permission to do this.

Section II of the Government's Memo alleges that probationer,

> in violation of Maine Criminal Code Title 17–A § 703 "forgery," while involved in a business venture called Mayville's Tavern, Inc. in Bethel, Maine, ... did with the intent to defraud or deceive another person, falsely make, complete and endorse written instruments, specifically checks. The defendant did not have authority to sign checks on behalf of the Corporation. He was not an officer of the Corporation and did not have signature authority on any corporate accounts. He did, however, on many occasions, forge the signature of Alexander MacGregor, then president of Mayville's, on checks. Many of those checks were made payable to the defendant himself. Many shareholders of Mayville's Tavern will testify to the facts above including Alexander "Sandy" MacGregor, Gary Galovic, Phillipe See and David Lemieux.

Maine Criminal Code Title 17–A § 703(1)(A) provides:

> 1. A person is guilty of forgery if, with the intent to defraud or deceive another person or government, he:
>> A. Falsely makes, completes, endorses or alters a written instrument, or knowingly utters or possesses such an instrument....

Further, in paragraph 5 of the Petition, it is alleged that

> In or about April 1992, the probationer formed a corporation with six other individuals, most of whom were fellow ski patrollers at Sunday River Ski Resort, in order to establish and operate a restaurant, Mayville Tavern, in Bethel, Maine....

> The probationer had picked his partners well—all individuals who had other jobs and occupations and, therefore, were not interested in the day to day operation of the restaurant. The probationer was, therefore, the logical choice to be general manager. He kept the books and would not let anyone else see them. It has now

been discovered, after he lost his shares, that he was not paying bills, especially withholding taxes and sales taxes.

In addition, the partners have discovered that he forged checks, signing the corporate signatories names as well as his own on several occasions, even though he did not have signatory power.

Section V of the Government's Brief states, the defendant, in violation of Maine Criminal Code Title 17–A § 354 "theft by deception" did obtain or exercise control over property of another as a result of deception and with an intention to deprive him thereof, relative to the defendant's business dealings with shareholders of Mayville's....

....

The evidence of this violation will demonstrate false and fraudulent activity by Mr. Flynn including *forging checks and repaying himself out of corporate funds without corporate authority.* Mr. Flynn obtained ten percent interest in this Corporation without exposing himself to financial liability and *induced others to part with funds through false representations.*

(Emphasis added.)

Maine Criminal Code Title 17–A § 354 provides:

**Theft by deception.**

1. A person is guilty of theft if he obtains or exercises control over property of another as a result of deception and with an intention to deprive him thereof.

2. For purposes of this section, deception occurs when a person intentionally:

A. Creates or reinforces an impression which is false and which that person does not believe to be true, including false impressions as to law, value, knowledge, opinion, intention or other state of mind. Provided, however, that an intention not to perform a promise, or knowledge that a promise will not be performed, shall not be inferred from the fact alone that the promise was not performed.;

B. Fails to correct an impression which is false and which he does not believe to be true, and which:

(1) He had previously created or reinforced; or which

(2) He knows to be influencing another whose property is involved and to whom he stands in a fiduciary or confidential relationship;

C. Prevents another from acquiring information which is relevant to the disposition of the property involved; or

D. Fails to disclose a known lien, adverse claim or other legal impediment to the enjoyment of property which he transfers or encumbers in consideration for the property obtained, whether such impediment is or is not valid, or is or is not a matter of official record.

3. It is no defense to a prosecution under this section that the deception related to a matter than was of no pecuniary significance, or that the person deceived acted unreasonably in relying on the deception.

Flynn was the principal organizer and became the manager of Mayville's Tavern. The court finds credible the testimony of Mary Schultz, a shareholder in Mayville's Tavern, who testified that Flynn's management style was akin to spokes in the wheel with Flynn in the center, that he was the main focus of information, that there was no connection between the spokes at all, and that he kept each isolated from the other and encouraged them not to communicate.

*(1) The Written Instruments at Issue*

The court finds credible the testimony of Alexander "Sandy" MacGregor that he did not sign the following checks, each of which bears on its face a signature purporting to be MacGregor's:

*Government Exhibit 2–A,* a negotiated check numbered 199, dated December 8, 1992, drawn on the account of Mayville Tavern, Inc., Bethel, Maine, at the Bethel Savings Bank, made payable to John Flynn in the amount of $18,500.00;

*Government Exhibit 2–B,* a photocopy of the face and back of a negotiated check numbered 143, dated February 15, 1993, drawn on the credit card account of May-

ville's Tavern, Inc., Bethel, Maine, at the Key Bank of Maine, Bethel, Maine, made payable to John Flynn in the amount of $550.00, with the notation "Reimbursement" handwritten in the memo portion of the check;

*Government Exhibit 2–H*, a photocopy of the face and back of a negotiated check numbered 1104, dated November 27, 1992, drawn on the account of Mayville's Tavern, Inc., Bethel, Maine, at the Key Bank of Maine, made payable to John Flynn in the amount of $1,500.00, with the notation "Reimbursement" handwritten in the description portion of the check;

*Government Exhibit 2–I*, a photocopy of the face and back of a negotiated check numbered 1105 with the date appearing as – 27–92,[2] drawn on the account of Mayville's Tavern, Inc., at the Key Bank of Maine, made payable to John Flynn in the amount of $4,000.00, with the notation "Reimbursement" handwritten in the description portion of the check;

*Government Exhibit 2–P*, a copy of the front of a check numbered 1050, mechanically imprinted with the date of October 22, 1992, drawn on the account of Mayville's Tavern, Inc., at Key Bank of Maine,[3] made payable to John Flynn in the amount of $10,000.00 with the notation "Repayment of Loan" handwritten in the description portion of the check. This exhibit also contains a photocopy of a deposit ticket reflecting a deposit of $10,000 into account number 01–20–004320[4] of the Bethel Savings Bank, hand dated October 22, 1992, and mechanically imprinted Oct. 22, 1992. The mechanically imprinted date and subsequent symbols match the date and symbols mechanically imprinted on the check.

### (2) Versions of MacGregor's Signature

Defendant's Exhibit B is a letter to John P. Flynn dated August 3, 1992. The court finds credible the testimony of Alexander MacGregor that the signature appearing on this document is his.

Defendant's Exhibit D at 2 contains, inter alia, a photocopy of the face of a check numbered 1203, with the date appearing as /15/93, drawn on the account of Mayville's Tavern, Inc. at Key Bank of Maine, made payable to Payroll Management in the amount of $4,099.68, with the notation "Payroll" handwritten in the description portion of the check. Defendant's Exhibit D at 3 contains the original of this check, which reveals that it is dated 1/15/93. This court finds credible Deborah Parsons' testimony that, with the exception of the words "Payroll Management", all of the writing contained on the face of said check is in the handwriting of John Flynn. Accordingly, the court is reasonably satisfied that the signature in the lower right-hand corner of said check purporting to be that of Alexander MacGregor was actually written by the probationer.

Government Exhibit 50 is a yellow sheet of paper containing a handwriting sample of defendant's witness Deborah Parsons produced by her at the hearing during cross-examination by the government. This handwriting sample contains, inter alia, two examples of Parsons' signing of "Alexander MacGregor" and two examples of Parsons' signing of "Alexander P. MacGregor."

### (3) Comparison of Signatures

Comparing the aforementioned versions of MacGregor's signature with the purported Alexander MacGregor signatures appearing on the face of (1) check number 199 of Gov-

---

2. The court notes that (1) the left-most portion of the date's notation was not photocopied and (2) the back of this check contains a Key Bank of Maine imprint NO '92' 27 and the mechanically imprinted symbols 27 NOV '' 92.

3. Although the account name is obscured, the photocopied check bears the account number 700414881, matching the account number of the Mayville's Tavern, Inc., account at Key Bank of Maine. *See* Government Exhibit 6 (Mayville's Tavern, Inc., account statement for account number 700414881 at Key Bank of Maine).

4. This is the number of an account held by the probationer at the Bethel Savings Bank. *See, e.g.,* Government Exhibit 25–C at 9 (photocopy of September 23, 1992, debit memo for wire transfer from John P. Flynn, Jr., account number 01 20 004320); Government Exhibit 26A (photocopy of deposit ticket for account of John P. Flynn, Jr., at the Bethel Savings Bank bearing the printed account numbers 01 20 004320).

ernment Exhibit 2–A; (2) check number 143 of Government Exhibit 2–B; (3) check number 1104 of Government Exhibit 2–H; (4) check number 1105 of Government Exhibit 2–I; and (5) check number 1050 of Government Exhibit 2–P, the court is reasonably satisfied that Flynn wrote the signature purporting to be that of Alexander MacGregor which appears on the face of said checks.

The court finds less than credible Deborah Parsons' testimony (1) that she is not sure who signed the face of the check contained in Government Exhibit 2–P; (2) that she would assume that such signature is hers; (3) that she thinks she signed it.

The court finds less than credible Deborah Parsons' testimony (1) that she wrote the signature on the face of the check contained in Government Exhibit 2–B; (2) that she believes she signed the check contained in Government Exhibit 2–B; (3) that the signature on the check contained in Government Exhibit 2–H is hers; (4) that the signature on the check contained in Government Exhibit 2–I is hers; (5) that she signed the check contained in Government Exhibit 2–P; (6) that she believes she signed the check for $18,500 which is contained in Government Exhibit 2–A.

### (4) Intent to Deceive

The Supreme Judicial Court of Maine has stated that

"proof of the accused's intent at the time of the commission of the alleged criminal act may be drawn from the act itself or from the existing circumstances surrounding the incident, as well as from any other evidence having a legitimate tendency to shed light upon the accused's intent or mental state at the time."

*State v. Pinkham–Murch (Kay)*, 432 A.2d 1297, 1300 (Me.1981) (quoting *State v. Anderson*, 409 A.2d 1290, 1296 (Me.1979)).

* The court finds credible the testimony of Mayville's Tavern investors Phillippe Sée and Alexander MacGregor as to a meeting at the restaurant at which John Flynn, Gary Galovic, Sée, and MacGregor were present. According to Sée, during this meeting MacGregor stated that Flynn had told him that he,

Flynn, had borrowed money from the corporation for his personal use. MacGregor testified that the amount Flynn had borrowed was $1,500, and that when he, MacGregor, brought up the subject of the alleged "loan," Flynn accused them of holding an execution-style meeting. Sée testified, and MacGregor's testimony corroborates, that after denying that he had taken the $1,500 "loan," Flynn said "if he ever wanted to take money out of the corporation he would be perfectly capable of doing so and no one would ever know about it."

The court finds unconvincing the defense that *probationer's signing of the checks at issue in Alexander MacGregor's name was authorized. Probationer's Post–Hearing Memorandum and Request for Findings of Fact and Rulings of Law at 4.*

MacGregor testified that he himself signed blank checks for Flynn and Deborah Parsons to use for Mayville's Tavern business.

Regarding MacGregor's testimony that Flynn told him on a few occasions that he, Flynn, had signed checks, the court is reasonably satisfied, based on the evidence before it, that MacGregor only gave Flynn authority to sign checks when it would be inconvenient for MacGregor to come to the restaurant to sign checks to pay vendors. *See, e.g.,* Testimony of Michael O'Donnell (indicating that MacGregor told him that it was inconvenient for MacGregor to go into the restaurant and that it was more convenient to have Flynn sign the checks); Testimony of Alexander MacGregor (indicating that although Flynn told him on a few occasions that he, Flynn, had signed checks, there were checks Flynn signed which he did not know about and that MacGregor told Flynn that he did not want Flynn signing his name); Testimony of David Lemieux (indicating on defendant's cross-examination that MacGregor told him Flynn had signed MacGregor's name to a check without MacGregor's authority).

The court finds credible the testimony of David Lemieux, a shareholder in Mayville's Tavern, who testified that in a December 1992 meeting Flynn stated that the corporation owed $8,300 in taxes and Flynn wanted to take out another loan or wanted the share-

holders to contribute funds to pay this debt. Lemieux testified that in response he loaned the corporation $8,400. On defendant's cross-examination, Lemieux expressed his anger as to the $18,500 payment to Flynn reflected in Government Exhibit 2–A because said payment was made prior to Flynn's request for funds to pay the tax debt.

Defendant contends that the payment of $18,500 to Flynn was authorized by the corporation at a shareholders' meeting held on October 26, 1992. Defendant's Post–Hearing Memorandum and Findings of Fact and Rulings of Law at 8 (citing Defendant's Exhibit C). Defendant's Exhibit C purports to be a photocopy of the minutes of the October 26, 1992, shareholders' meeting. It states in part, "The firm should be receiving Gavin Donegal's $25,000 investment in the next two weeks. A $18,500 loan to John F. will be paid off first." The court notes that Exhibit C is unsigned.

Alexander MacGregor testified that Flynn ran the shareholders' meetings, which accomplished little and were not run professionally. With regard to Defendant's Exhibit C, MacGregor testified that he could not remember any discussion pertaining to a shareholders' agreement to pay Flynn money at that meeting and that there was no agreement to pay Flynn alone and no agreement to pay any shareholder until the restaurant was solvent.

Based on the evidence before it, the court is reasonably satisfied that Mayville's Tavern, Inc., did not authorize the $18,500 payment to Flynn reflected in Government Exhibit 2–A or the payments to Flynn reflected in Government Exhibits 2–B, 2–H, 2–I, and 2–P.

Based on the evidence before it, the court is reasonably satisfied that Flynn violated Condition No. 1 of his probation (1) by violating Maine Criminal Code Title 17–A § 703(1)(A), and (2) by violating Maine Criminal Code Title 17–A § 354.

### b. Threats of Violence: Mayville's Tavern

■ Paragraph 1 of the Petition states, "The probationer threatened to shoot Sandy MacGregor, a partner at Mayville Tavern." Section I of the Government's Brief states,

> the defendant, in violation of Maine Criminal Code Title 17–A § 209 'criminal threatening' ... threatened Alexander MacGregor in or about February of 1992. Mr. MacGregor will testify that while involved in a business relationship with the defendant, he was engaged in conversation with the defendant concerning a possible 'buy out.' The defendant indicated to Mr. MacGregor that another stockholder in the corporation, Mary Schultz, might provide funding to buy out several shareholders. Mr. MacGregor spoke with Mary Schultz to confirm this information and found that what the defendant had said was incorrect. Mr. MacGregor confronted the defendant with this, at which point, the defendant told Mr. MacGregor if he (Mr. MacGregor) ever spoke to Mary Schultz again, he'd (the defendant) get a gun and shoot him.

Government's Brief at 3.

Maine Criminal Code Title 17–A § 209(1) provides, "A person is guilty of criminal threatening if he intentionally or knowingly places another person in fear of imminent bodily injury." Although the court finds credible the testimony of Alexander "Sandy" MacGregor that on one occasion Flynn, in reference to Mary Schultz, stated, "If you ever talk to that woman again, I will get a gun and I will shoot you," the court finds that the evidence before it is not such as to reasonably satisfy it that this threat placed MacGregor "in fear of *imminent* bodily injury." *Id.* (Emphasis added.)

Further, regarding the references in Section I of the Government's Brief to alleged statements made by Flynn to Gale Nelson and Richard Emmons as to Flynn's purported association with an individual named "Fat Tommy", the court notes that the government presented no evidence showing that Flynn discussed said individual in a manner which placed another person in fear of imminent bodily injury.

Accordingly, the court finds that the probationer did not violate Condition No. 1 of his probation by committing the offense of "criminal threatening."

#### c. Theft by Deception: Puddles Restaurant

■ In paragraph 7 of the Petition, it is alleged that

[o]n or about November 8, 1990, the probationer falsely representing himself as the owner of Puddles Restaurant on Little Cranberry Island/Bar Harbor entered into an agreement/contract with the U.S. Department of Interior to share in the cost of repairing and maintaining the Department of Interior's rest room facilities on Little Cranberry Island in exchange for the Department of the Interior agreeing to allow his patrons (Puddles Restaurant) unrestricted use of the facilities. The probationer contracted to have the necessary work on the rest rooms performed by a local plumbing and heating firm. However, when neither the probationer nor Puddles Restaurant paid this local company, the Department of the interior "felt obligated to satisfy these unpaid obligations, rather than to leave local business persons to suffer financially because of non-payment." The U.S. Department of Interior paid approximately $1,400 to local vendors because of the fraudulent actions of the probationer.

Section VII of the Government's Brief states,

the defendant has violated Maine Criminal Code Title 17–A § 353, theft by deception.... He created and reinforced an impression which was false, and which the defendant did not believe to be true, in that he negotiated with the United States Department of the Interior to share the cost of repairing and maintaining the Department of Interior's restroom facility on Little Cranberry Island (the island upon which Puddle's Restaurant, a business venture in which Mr. Flynn worked was located). In November of 1990, Mr. Flynn, holding himself out to be the owner of Puddles, when in fact he was not the owner of Puddles, signed an agreement with the Department of the Interior and negotiated for certain work to be done. Mr. Flynn contracted with crafts people to have work performed with the understanding that he would pay those local crafts persons. Mr. Flynn did not pay those crafts people and because the repairs had been effectuated on Department of Interior property, the United States Government paid approximately $1,400.

The court finds and rules that the evidence before it is less than sufficient to reasonably satisfy it that probationer violated Condition No. 1 of his probation in the manner alleged in paragraph 7 of the Petition and Section VII of the government's brief.

#### e. Wire Fraud/Credit Card Fraud/Theft by Deception: The Rostay

■ In paragraph 8 of the Petition, it is alleged that "[i]n or about August and September of 1992, the probationer by means of deceit, convinced the part owner of the Rostay Motor Inn in Bethel, Maine, Fidelis Taylor, to submit for payment false bills to American Express for reimbursement." Section VIII of the Government's Brief states,

the defendant has violated Title 18, United States Code §§ 1343 (wire fraud) and 1029 (credit card fraud) as well as Maine Criminal Code Title 17–A § 354 (theft by deception). As set forth in the Petition, over several months the defendant used an American Express credit card issued to his father in order to fraudulently and falsely obtain money belonging to American Express. The defendant did this by convincing his friend of two years, retired Catholic Nun/school teacher Fidelis Taylor, who, along with her partner, owns the Rostay Motor Inn in Bethel, Maine, to allow him to get the equivalent of "cash advances" or "loans" from American Express.

#### (1) Wire Fraud

Under 18 U.S.C. § 1343 (Supp.1993),

**Fraud by wire, radio, or television**

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or arti-

fice, shall be fined not more than $1,000 or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

The government has presented no evidence showing a transmission "by means of wire, radio, or television communication in interstate or foreign commerce." Further, although the government requests that the court "take judicial notice of the fact that American Express utilizes interstate wires or that the banks involved, in conjunction with the Federal Reserve, utilize interstate wires," Government's Post–Hearing Memo at 3, this request comes upon completion of the hearing, and the government does not specify a source of the information at issue. Accordingly, the court is less than reasonably satisfied that probationer has violated section 1343.

*(2) Credit Card Fraud/Theft by Deception*

■ Under 18 U.S.C. § 1029 (Supp.1993), **Fraud and related activity in connection with access devices**

 (a) Whoever—

 . . . .

 (2) knowingly and with intent to defraud traffics in or uses one or more unauthorized access devices during any one-year period, and by such conduct obtains anything of value aggregating $1,000 or more during that period;

 . . . .

shall, if the offense affects interstate or foreign commerce, be punished as provided in subsection (c) of this section.

 . . . .

 (e) As used in this section—

 (1) the term "access device" means any *card,* plate, code, account number, or other means of account access than can be used, alone or in conjunction with another access device, to obtain money, goods, services, or any other thing of value, or than can be used to initiate a transfer of funds (other than a transfer originated solely by paper instrument);

 . . . .

 (3) the term "unauthorized access device" means any access device that is lost, stolen, expired, revoked, canceled, or *obtained with intent to defraud.*

(Emphasis added.)

The court finds credible the testimony of Fidelis Taylor, co-owner of the Rostay Motor Inn in Bethel, Maine, with her partner Jeanne M. Rossi. Taylor testified that she met Flynn in the summer of 1991 when he came to the Rostay looking for a room and that she mentioned to him in a discussion that they were planning to sell the motel; she also mentioned enlarging the motel. Taylor testified that Flynn said he would help them enlarge the motel and that he eventually did so, by helping to plan the finances, going to a bank, getting a surveyor, and helping with regard to the planning board. Taylor testified that an expansion was eventually financed through a loan from the Bethel Savings Bank and that during construction for said expansion Taylor and Rossi left Flynn in charge while they went on vacation.

Taylor testified that Flynn came to her house at the Rostay on May 26, 1992, seeking to borrow cash from his father's American Express card. According to Taylor, Flynn stated that he had permission from his father to use said card, and asked her to take the card, run it through the Rostay's American Express card machine, and write him a check for the amount charged.

Government Exhibit 1–A contains photocopies of (1) a service establishment copy of an American Express card transaction between card member John P. Flynn and service establishment Rostay Motor Inn reflecting a charge of $1,450—the charge is not dated, but imprinted near the top of the document is the phrase "5/91 THRU 12/93;" (2) the face and back of a negotiated check numbered 454, dated May 26, 1992, drawn on the account of Rostay Motor Inn, at the Bethel Savings Bank, made payable to John Flynn in the amount of $1,450.

Taylor testified that on July 6, 1992, Flynn caused $2,500 to be charged on his father's American Express card. Flynn told the Rostay owners to write him a check for $1,500

instead of $2,500, saying that by doing so they would have repayment of a $1,000 loan they had previously made to him. They did so. Government Exhibit 1–B contains photocopies of (1) a service establishment copy of an American Express card transaction between card member John P. Flynn and service establishment Rostay Motor Inn, reflecting a charge of $2,500—the charge is not dated but imprinted near the top of the document is the phrase "5/91 THRU 12/93;" (2) the face and back of a negotiated check numbered 541, dated July 6, 1992, drawn on the account of Rostay Motor Inn, Jeanne M. Rossi, Fidelis F. Taylor at the Bethel Savings Bank, made payable to John Flynn in the amount of $1,500.

Government Exhibit 1–D contains photocopies of (1) a service establishment copy of an American Express card transaction dated August 4, 1992, between John P. Flynn and service establishment Rostay Motor Inn, reflecting a charge of $1,000, and (2) the face and back of a negotiated check numbered 590, dated August 4, 1992, drawn on the account of Rostay Motor Inn, Jeanne M. Rossi, Fidelis F. Taylor at the Bethel Savings Bank, made payable to John Flynn in the amount of $1,000.

Taylor testified that the same procedure was used by Flynn to borrow $4,000 as reflected in Government Exhibit 1–E. That exhibit contains photocopies of (1) a service establishment copy of an American Express card transaction between card member John P. Flynn and service establishment Rostay Motor Inn dated August 16, 1992, reflecting a charge of $4,000; (2) the face and back of a negotiated check numbered 632, dated August 17, 1992, drawn on the account of Rostay Motor Inn, Jeanne M. Rossi, Fidelis F. Taylor at the Bethel Savings Bank, made payable to John Flynn in the amount of $4,000.

Taylor's testimony indicated that the same procedure was used by Flynn to borrow $9,800 on August 26, 1992. Government Exhibit 1–F contains photocopies of (1) a service establishment copy of an American Express card transaction between card member John P. Flynn and service establishment Rostay Motor Inn dated August 26, 1992, reflecting a charge of $9,800; (2) the face and back of a negotiated check number 650, dated August 26, 1992, drawn on the account of Rostay Motor Inn, Jeanne M. Rossi, Fidelis F. Taylor at the Bethel Savings Bank, made payable to John Flynn in the amount of $9,800.

Government Exhibit 1–G contains photocopies of (1) a service establishment copy of an American Express card transaction between card member John P. Flynn and service establishment Rostay Motor Inn dated September 21, 1992, reflecting a charge of $12,000; (2) the face and back of a negotiated check numbered 671 dated September 21, 1992, drawn on the account of Rostay Motor Inn, Jeanne M. Rossi, Fidelis F. Taylor at the Bethel Savings Bank, made payable to John Flynn in the amount of $11,072. Taylor testified that as to the documents contained in Government Exhibit 1–G, the difference in the amount of the charge and the amount of the check reflected her realization that American Express would be charging the Rostay interest on the amount charged.

Taylor testified that Flynn objected to his being charged for the interest, and that Government Exhibit 1–H reflects a subsequent loan to Flynn. Government Exhibit 1–H contains photocopies of (1) a service establishment copy of an American Express card transaction between card member John P. Flynn and service establishment Rostay Motor Inn, dated September 25, 1992, reflecting a charge of $19,000; (2) the face and back of a negotiated check numbered 0702 dated September 25, 1992, drawn on the account of Rostay Motor Inn, Inc., Jeanne M. Rossi/Fidelis F. Taylor at the Bethel Savings Bank, made payable to John Flynn in the amount of $19,000.

Taylor further testified that after the September 26 transaction, American Express notified her that she would be required to obtain approval for any transaction over $1,200 and that when she informed Flynn of this he communicated to her that he did not want her to do another American Express transaction, and he stated, "Somebody must be watching." Taylor testified that when she asked Flynn why he didn't use his own American Express machine at his restaurant,

he stated that he didn't want people to see his use of the machine.

Taylor testified that American Express contacted her about $31,000 borrowed by Mr. Flynn, that American Express said to get a lawyer, that the money would have to be paid back, and that if Flynn did not pay the money back, she would be liable.

Flynn's father, John P. Flynn, testified that he had given the probationer his American Express card. He said there remains an outstanding balance on the card, that over a year ago he saw a bill in excess of $30,000, and that he did not make the purchases. He said that the card has been canceled. Flynn's father testified that the probationer would send him the money for charges the probationer made on the card and that he, Flynn's father, would pay American Express. He said that at first the charges were for relatively small amounts, and that probationer never told him that he wanted to take out $50,000 in loans.

Based on the evidence before it, the court is reasonably satisfied that the probationer violated Condition No. 1 of his probation by violating 18 U.S.C. § 1029 (Supp.1993) and Maine Criminal Code Title 17–A § 354.

### f. Insurance Fraud

■ In paragraph 9 of the Petition, it is alleged that

[o]n or about December 14, 1990, the probationer falsely representing himself as executor of the Emmons Family Trust, called Maine Mutual Insurance in Presque Isle, Maine from his home in Massachusetts to notify the insurance company that an exceedingly high tide caused damage to Puddles Restaurant/Emmons Family Trust, Little Cranberry Island, Maine, which was insured through National Flood Insurance Program (Federally funded program). The probationer by use of telephone and mail, made a fraudulent claim for flood damages.

Section IX of the Government's Brief states,

the defendant has violated Title 18, United States Code §§ 1341 (mail fraud) and 1343 (wire fraud) as well as Maine Criminal

Code Title 17–A § 354 (theft by deception) in that he made a fraudulent insurance loss claim to Maine Mutual Insurance. The defendant, in late 1990 and early 1991, fraudulently represented himself as the "executor" of the Emmons Family Trust. The Emmons Family Trust was a Trust established to hold real estate. The only trustee of the trust was Gale Nelson. The Trust owned a business, Puddles, a restaurant on Little Cranberry Island in Maine. The defendant claimed, to Maine Mutual Insurance Company who had a flood insurance policy in effect covering the premises, that there was severe flood damage caused on November 20, 1990.... In fact, although there was some damage caused by the flood in 1990, the vast majority of the damage was unrelated.

The court finds and rules that the evidence before it is less than sufficient to reasonably satisfy it that probationer violated Condition No. 1 of his probation alleged in paragraph 9 of the Petition and Section IX of the government's brief.

### g. Bank Fraud

■ In paragraph 10 of the Petition, it is alleged that

[t]he probationer with witting or unwitting cooperation of Stanley McDonald, Vice President of Bar Harbor Banking and Trust Company, received $3,500 from the Emmons Family Trust Fund on March 1, 1991, without authorization from the trustee of the trust fund, Gale Nelson.... Additionally, on March 14, 1991, there was an additional transfer of $2,000 from the Emmons Family Trust to the probationer's joint account with Gale Nelson. Gale Nelson will testify that she didn't authorize that withdrawal, verbally or by writing, and that she never used the joint account.

Section X of the Government's Brief states,

the defendant has violated Title 18, United States Code § 1344 (bank fraud) by fraudulently persuading and convincing Stanley McDonald in the Bar Harbor Bank & Trust to give to John Flynn, $3,500 of the proceeds check of the insurance claim when he had no right to it and those funds

were under the custody, care and control of the Bar Harbor Bank & Trust.

Under the provisions of 18 U.S.C. § 1344 (Supp.1993),

> Whoever knowingly executes, or attempts to execute, a scheme or artifice—
>
> > (1) to defraud a financial institution; or
> >
> > (2) to obtain any of the moneys, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises; shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.

In order to prove bank fraud under 18 U.S.C. § 1344, the government must prove that the defendant (1) engaged in a scheme or artifice to defraud, or made false statements or representations to obtain money from; (2) a federally insured financial institution; and (3) did so knowingly. *United ed States v. Goldblatt*, 813 F.2d 619, 623–24 (3rd Cir.1987); *United States v. Cloud*, 872 F.2d 846, 850 (9th Cir.), *cert. denied*, 493 U.S. 1002 [110 S.Ct. 561, 107 L.Ed.2d 556] (1989). The terms "scheme" and "artifice" are defined to include "any plan, pattern or cause of action, including false and fraudulent pretenses and misrepresentations, intended to deceive others in order to obtain something of value, such as money, from the institution to be deceived." *Goldblatt*, 813 F.2d at 624 (citing *United States v. Toney*, 598 F.2d 1349, 1357 n. 12 (5th Cir.1979), *cert. denied*, 444 U.S. 1033 [100 S.Ct. 706, 62 L.Ed.2d 670] (1983)). "The term 'scheme to defraud,' however, is not capable of precise definition. Fraud instead is measured in a particular case by determining whether the scheme demonstrated a departure from fundamental honesty, moral uprightness, or fair play and candid dealings in the general life of the community." *Goldblatt*, 813 F.2d at 624; *see also United States v. Stavroulakis*, 952 F.2d 686, 694 (2d Cir.), *cert. denied*, [— U.S. ——] 112 S.Ct. 1982 [118 L.Ed.2d 580] (1992).

. . . .

"To act with the 'intent to defraud' means to act willfully, and with the specific intent to deceive or cheat for the purpose of either causing some financial loss to another, or bringing about some financial gain to oneself." *Cloud*, 872 F.2d at 852 n. 6 (citations omitted) (finding intent to defraud where defendant signed instructions "knowing that the bank could be deceived by materially false statements that appeared on the face of the instructions"); *see also United States v. Saks*, 964 F.2d 1514, 1518 (5th Cir.1992). "It is a well-established principle that fraudulent intent may be established by circumstantial evidence and inferences drawn from all the evidence." *Cloud*, 872 F.2d at 852 n. 6 (citations omitted); *United States v. Celesia*, 945 F.2d 756, 759–60 (4th Cir.1991), *see also United States v. Mason*, 902 F.2d 1434, 1442 (9th Cir.1990) ("Specific intent is established by 'the existence of a scheme which was reasonably calculated to deceive persons or ordinary prudence and comprehension, and this intention is shown by examining the scheme itself.'" (quoting *United States v. Green*, 745 F.2d 1205, 1207 (9th Cir.1984) (additional internal quotation omitted))).

*United States v. Brandon, et al.*, 17 F.3d 409, 424–425 (1st Cir.1994).

On defendant's cross-examination, USPO Frost stated his belief that the one-page document identified as Defendant's Exhibit U came from the file of Attorney Michael O'Donnell. This document contains the handwritten heading "note, 4–5–91" and twelve separate dated typewritten entries. The entry dated 4/5/91 states:

> Telephone call from Gale regarding restructuring of Ferris loan, possible bankruptcy, flood damage loss in fall of '90, appraised value of real estate, investment by Vickie, how to handle Richard, possibility of bringing in "investor", possibility of sale of real estate to bail out; *telephone cal [sic] to Gale regarding unauthorized withdrawals from Puddles account in Bar Harbor Bank and how to handle same— memo for file.*

(Emphasis added.) Regarding this entry, Frost testified that in a July 1993 meeting with Gale Nelson, Nelson referred to unauthorized withdrawal from the trust account of the Emmons Family Trust as a conspiracy between Flynn and Stanley MacDonald.

H. Stanley MacDonald testified on the government's direct examination as to the actions taken by him in his role as a bank officer at the Bar Harbor Banking and Trust Company, Bar Harbor, Maine.

MacDonald testified that he became aware of an insurance proceeds check to the Emmons Family Trust through various communications with Flynn and Gale Nelson occurring between December 1990 and January or February of 1991.

Government Exhibit 45 is a photocopy of the face and back of a negotiated check dated February 22, 1991, drawn on the account of Maine Mutual Group of Insurance Companies, at Maryland National Bank, Baltimore, Maryland, made payable to Emmons Family Real Estate Trust and Bar Harbour Bank & Trust, Isleford Dock, Isleford, Maine, in the amount of $38,939.00.

MacDonald testified that a check from Maine Mutual for approximately $38,000 was brought to him by Flynn. MacDonald further testified that he endorsed said check on behalf of the Emmons Family Trust and on behalf of Bar Harbor Bank and Trust, and that the check was deposited into the trust account of the Emmons Family Trust, numbered 81502390, which testimony is corroborated by the photocopy of the back of the check contained in Government Exhibit 45.

MacDonald testified that the sole trustee with authority to endorse on said account was Gale Nelson. Government Exhibit 46 is a six-page typewritten document with the heading "Declaration of Trust". On page 1 of said document, Gale E. Nelson is named as the only trustee for the Emmons Family Trust.

Government Exhibit 44 is a one-page handwritten document dated February 28, 1991, with the heading "John Flynn" and containing a list of numbers and corresponding descriptions. Near the bottom of the page is the phrase "Total Change to 815-0239-0", followed by the number "15,800.33". The entry on said document labeled 4)f) states, "Treas checks payable to John Flynn 3", followed by the entries "1) 2,500.00 2) 600.00 3) 400.00". Government Exhibit 43 contains, inter alia, a debit memo from Bar Harbor Banking and Trust Company dated March 1, 1991, reflecting a total change to account number 815-0239-0 in the amount of $15,811.33.

MacDonald testified that he met with Flynn at 4:30 p.m. on February 28, at which time the insurance proceeds check was deposited to the trust account of the Emmons Family Trust, and $15,811.33 was taken out of the trust account of the Emmons Family Trust.

MacDonald testified that the $15,811.33 funded three treasurer's checks, made payable to Flynn, in the amounts of $2,500, $600, and $400, corresponding to the notations in Government Exhibit 44. MacDonald testified that he gave these treasurer's checks to Flynn at their February 28 meeting.

The court finds less than credible MacDonald's testimony that he does not remember who signed said treasurer's checks. The court finds credible MacDonald's testimony that it was probably he who signed said checks.

MacDonald testified that Gale Nelson gave no written authorization to disburse the $3,500 to Flynn.

In response to the government's question as to whether MacDonald could tell the court with certainty whether Gale Nelson gave authority to disburse $3,500 from the insurance proceeds check to Flynn, MacDonald testified that he could not clearly remember. The court finds said response less than credible.

The court finds credible MacDonald's testimony that, at the time of the insurance proceeds check incident, he was involved in a business venture with Flynn which he referred to as a motel project, East Cove Associates. MacDonald testified that he talked with Flynn about East Cove Associates in December 1990 and January 1991, and that East Cove Associates was incorporated in April 1991.

The court finds unconvincing probationer's argument that his reported receipt of the $3,500 on his March 1991 MSR, contained at Exhibit 5, shows the absence of wrongdoing. Probationer's Post–Hearing Memo at 17. Further, the court finds unconvincing probationer's suggestion that the bank fraud allegations are not credible because the amount alleged to have been taken is small in comparison to the full amount of the insurance proceeds check. *See id.*

Based on the evidence before it, the court is reasonably satisfied that the probationer violated Condition No. 1 of his probation by violating 18 U.S.C. § 1344(1) and (2) (Supp. 1993).

The court is less than reasonably satisfied that the transfer of $2,000 from the trust account of the Emmons Family Trust to probationer's joint account with Gale Nelson, trustee of said trust, violated section 1344.

### h. Theft of Property

■ In paragraph 11 of the petition, it is alleged that "[w]hen the probationer moved out of his residence at the Mayville Tavern in or around June, he took $1,000 worth of furniture which belonged to Gary Galovic. Section XI of the Government's Brief refers to this alleged conduct as a violation of Maine Criminal Code Title 17–A § 353, which provides:

### § 353. Theft by unauthorized taking or transfer

1. A person is guilty of theft if he obtains or exercises unauthorized control over the property of another with intent to deprive him thereof.

2. As used in this section, "exercises unauthorized control" includes but is not necessarily limited to conduct heretofore defined or known as common law larceny by trespassory taking, larceny by conversion, larceny by bailee and embezzlement.

Gary Galovic and Flynn were renters of a residence owned by Mayville's Tavern, Inc.

Galovic testified on direct examination that he and Flynn each contributed $1,000 to purchase furniture for this residence and that when Flynn left the residence Flynn took the furniture.

On defendant's cross-examination, Galovic stated that he doesn't know who took the furniture or where it is, and that he told USPO Frost that the furniture was there before Flynn moved out and was not there when Flynn left.

The court finds credible the testimony of Martha Katlin, sister of Deborah Parsons, that she was present at the residence in the early summer of 1993 during and after Flynn's moving out of the residence. Katlin stated that when Flynn had moved out and left the keys behind, Galovic's property remained inside the residence. Accordingly, the court is reasonably satisfied that probationer did not violate Condition No. 1 of his probation in the manner alleged in paragraph 11 of the petition and Section XI of the Government's Brief.

### i. Violation of 18 U.S.C. § 1001

■ In Paragraph 12 of the petition, it is alleged that the probationer violated 18 U.S.C. § 1001 by submitting false Monthly Supervision Reports (MSR).

Section 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

As to the MSRs at issue, Flynn allegedly failed to report money he received from loans.[5] During closing argument at the

5. Paragraph 12 of the petition describes the unreported loans:

| MSR | Loan Amount | Loan Source | Date |
|---|---|---|---|
| Nov. 1988 | $ 4,200 | Richard Emmons | 11/08/88 |
| Oct./Nov./Dec. 1990 | 9,550 | $20,000 bank loan Flynn/Nelson | 12/19/90 |

hearing, defendant acknowledged that there was not compliance with MSR reporting, but argued that his failure to include the $8,000 loan from Phillippe Sée on the November 1992 MSR was not a violation because the MSR form in question did not contain a specific reference to money received from loans. The court agrees that the evidence before it is not sufficient to reasonably satisfy it that Flynn filed a false MSR for the month of November 1992.

### (1) The November 1988 MSR

 In his testimony, USPO Frost indicated that the probationer filed a false MSR for the month of November 1988.

Government Exhibit 48 is contains, inter alia, (1) Flynn's USPO District of New Hampshire MSR for the month of November 1988, signed by the probationer and dated December 15, 1988; (2) a document entitled "PROMISSORY NOTE" dated July 1, 1989, purporting to represent a promise by John Flynn to pay to the order of Victoria J. Emmons and Richard B. Emmons the sum of $4,000 or $4,200;[6] and (3) a copy of the front and back of a negotiated check dated November 8, 1988, drawn on the account of Richard B. Emmons and Victoria J. Emmons, Yarmouth, Maine, at Maine National Bank, Portland, Maine, made payable to John P. Flynn, Jr., in the amount of $4,200 and containing the notation "loan" in the memo portion of the check. Based on the evidence before it, the court is reasonably satisfied that in November 1988 Flynn received a $4,200 loan

from Victoria J. Emmons and Richard B. Emmons.

USPO Frost testified, and Flynn's November 1988 MSR reflects, that Flynn did not report this loan in either of the spaces provided on the November 1988 MSR form for money received.[7] Accordingly, and based on the evidence before it, the court is reasonably satisfied that Flynn violated 18 U.S.C. § 1001 by knowingly and willfully filing a false MSR for the month of November 1988.

### (2) The September/October/November/December 1990 MSR

Government Exhibit 48 further contains, inter alia, (1) Flynn's USPO District of New Hampshire MSR for the months of September,[8] October, November, and December 1990; (2) a document entitled Loan Closing Statement, Gale Nelson, John Flynn, Emmons Family Trust, December 19, 1990, reflecting a new one-year note in the amount of $20,000 and a deduction, inter alia, of $9,550 from this amount, notated as "Less Deposit to Clear Overdraft on Account # 811–13165; (3) a photocopy of a bank statement for account 81113165 in the name of John P. Flynn and Gale Nelson, reflecting activity during the period from September 24, 1990, through October 21, 1990, showing a beginning and ending statement balance of $9,532.15—".

Government Exhibit 40 contains a deposit agreement dated May 12, 1989, in the name of John P. Flynn, Jr., for Bar Harbor Banking and Trust account number 811–13165.

| Nov. 1992 | 8,000 |
| Aug. 1992 | 14,800 |
| | |
| Sept. 1992 | 31,000 |

| Phillippe Sée | 11/01/92 |
| American Express/ | 08/04/92 |
| Father | 08/16/92 |
| | 08/26/92 |
| American Express/ | 09/21/92 |
| Father | 09/25/92 |

---

6. The figure $4,000.00 is typed in the upper left-hand corner of this document. However, beneath the typed $4,000.00" is the handwritten figure "$4,200." Further, the language of the document refers to a promise to pay "the sum of FOUR THOUSAND DOLLARS"; however, following the word "DOLLARS" is a parenthetical containing the typed figure $4,000.00" which has been altered by hand to read "4,200.00".

7. The form in question contains two questions regarding money received: (1) Question No. 4

requires a listing of money received from employment, and (2) Question No. 6 requires a listing of all other money received and specifically refers to loans.

8. The court notes that on the first page of the MSR at issue, the words, "Oct. Nov. Dec. 1990" appear after the form words "MONTH OF:", while the word "Sept." appears above the word "Oct."

Said exhibit further contains balance and transaction records for this account showing a balance of "9,1532.15—" on September 23, 1990, and showing a deposit of $9,495.42 on December 31, 1990. USPO Frost testified that at least $9,550 of a $20,000 loan to Gale Nelson and Flynn went to make current Flynn's bank account, which was in arrears to that amount. Based on the evidence before it, the court is reasonably satisfied that in December 1990 Flynn received $9,550 of a $20,000 loan to Gale Nelson and himself.

Frost testified, and Flynn's September/October/November/December MSR reflects, that Flynn did not report this loan in either of the spaces provided on that MSR form for money received.[9] Accordingly, and based on the evidence before it, the court is reasonably satisfied that Flynn violated 18 U.S.C. § 1001 by knowingly and willfully filing a false MSR for the months of September–December 1990.

### (3) The August 1992 MSR

Frost testified that in the course of his investigation he interviewed Fidelis Taylor and that she presented him with copies of American Express transactions involving Flynn dated August 4, 1992, and August 26, 1992. Government Exhibit 48 contains, inter alia, (1) a photocopy of Flynn's MSR for the month of August 1992; (2) attached to said MSR, photocopies of service establishment copies of American Express card transactions between card member John P. Flynn and service establishment Rostay Motor Inn which reflect, inter alia, a charge of $1,000 on August 4, 1992, and a charge of $9,800 on August 26, 1992.

Frost testified, and the August 1992 MSR reflects, that Flynn did not report either the August 4, 1992, transaction or the August 26, 1992, transaction in either of the spaces provided on the August 1992 MSR for money received.[10] Accordingly, and based on the evidence before it, the court is reasonably satisfied that Flynn violated 18 U.S.C. § 1001 by knowingly and willfully filing a

false MSR form for the month of August 1992.

### (4) The September 1992 MSR

Frost testified that during his interview of Fidelis Taylor, she presented him with copies of American Express transactions whereby Flynn received $12,000 on September 21, 1992, and $19,000 on September 25, 1992. Government Exhibit 48 contains (1) a photocopy of Flynn's MSR for the month of September 1992; (2) attached to said MSR, photocopies of service establishment copies of American Express card transactions between card member John P. Flynn and service establishment Rostay Motor Inn, which reflect, inter alia, a charge of $12,000 on September 21, 1992, and a charge of $19,000 on September 25, 1992.

Frost testified, and the September 1992 MSR reflects, that Flynn did not report either the September 21, 1992, transaction or the September 25, 1992, transaction in either of the spaces provided on the September 1992 MSR form for money received.[11] Accordingly, and based on the evidence before it, the court is reasonably satisfied that Flynn violated 18 U.S.C. § 1001 by knowingly and willfully filing a false MSR form for the month of September 1992.

### j. Condition No. 4

 Condition No. 4 of Flynn's probation requires that he shall "not leave the judicial district without permission of the probation officer." Government Exhibit 41 (Conditions of Probation of John Flynn, signed by John Flynn, August 8, 1983, and USPO David M. Sawyer, August 8, 1983, reviewed by USPO Karen S. Daniels, April 6, 1992). Flynn is alleged to have violated said condition by taking a ski vacation to Crested Butte, Colorado, from approximately November 30, 1992, through December 7, 1992, without obtaining the permission of his probation officer to leave the district. During closing argument at the hearing, defendant acknowledged that he had committed this violation.

9. *See supra* note 7.

10. *See supra* note 7.

11. *See supra* note 7.

USPO Frost testified that in the course of investigation he was informed by certain of Flynn's partners in Mayville's Tavern, Inc., that Flynn had taken a ski trip to Colorado. Government Exhibit 42 [12] contains a photocopy of an invoice of Destinations Unlimited Travel Agency, 225 Main Street, So. Paris, Maine, addressed to Mr. Flynn and a photocopy of two airline tickets issued by Continental Airlines for passengers John Flynn and Deborah Parsons at a total cost of $900. Said documents indicate that Flynn and Parsons acquired tickets for a November 30, 1992, flight from Newark to Denver, returning from Denver to Newark on December 6, 1992. Government Exhibit 42 further contains a negotiated check dated November 3, 1992, drawn on the account of John P. Flynn, Jr., Bethel, Maine, at the Bethel Savings Bank made payable to Destinations Unlimited in the amount of $900.

Also contained in that exhibit are (1) a reservation confirmation form of Rocky Mt. Rentals, Property Management and Real Estate, Crested Butte, Colorado, indicating the purchase of accommodations for two adults at "Wood Creek # 103" by John Flynn, with arrival date of November 30, 1992, and departure date of December 6, 1992, and (2) a negotiated check dated November 30, 1992, drawn on the account of John P. Flynn, Jr., at the Bethel Savings Bank, made payable to Rocky Mountain Rentals in the amount of $440.40.

Having refreshed his memory by examining the documents contained in Government Exhibit 42, USPO Frost indicated that Flynn traveled to Colorado during the period from November 30, 1992, to December 6, 1992, while under supervision in the District of New Hampshire. Frost testified that he had contacted Flynn's probation officer during the period in question, USPO Karen Daniels of the District of New Hampshire, and asked if she had ever given Flynn permission to travel to Colorado, and was told, "Definitely not."

Accordingly, and notwithstanding defendant's acknowledgment, the court is reasonably satisfied that Flynn violated Condition No. 4 of his probation by taking a ski vacation to Crested Butte, Colorado, from approximately November 30, 1992, through December 6, 1992, without obtaining the permission of his probation officer to leave the district.

### k. Condition No. 2

■ Condition No. 2 of Flynn's probation states, "You shall associate only with law-abiding persons and maintain reasonable hours." Government Exhibit 41.

Paragraph 14 of the Petition states,

The U.S. Probation Department alleges that the probationer violated this condition by associating with James Meyers, a convicted felon and past co-conspirator with the probationer in the Stewart Meyers indictment. Members of Mayville Tavern will testify that the probationer told them that Meyers was paying for his ski vacation.

Further, the probationer recently advised that he found a new job with T.N. Marketing of Glen, New Hampshire, marketing vacation ownership. According to the company's 1993 Annual Report, James Meyers is listed as the firm's treasurer.

The Information to which Flynn pled guilty identifies James Meyers as a co-participant in the criminal acts out of which Flynn's probation arose. Information at 9. The reservation confirmation form of Rocky Mt. Rentals contained in Government Exhibit 42 indicates that guest John Flynn can be reached "c/o Jim Meyers, PO Box 561, Intervale, NH 03845," and indicate a telephone number for Jim Meyers. Said document further indicates a payment of $220 by TN Marketing.

USPO Frost testified that during his investigation he learned that James Meyers was an officer of TN Marketing, and that Meyers had paid part of Flynn's rental fee to Rocky Mountain Rentals. Frost further testified that Flynn told him he was pursuing a job with TN Marketing. In his testimony, Frost

12. Said exhibit is comprised of a manila folder labeled "Colorado Trip" which contains several documents.

indicated that the James Meyers involved in Flynn's Colorado trip was a co-defendant of Flynn in the matter out of which Flynn's probation arose.

Probationer argues that any involvement by Flynn with Meyers did not violate Condition No. 2 because Meyers "was not currently under any indictment or criminal complaint," and "was not on probation or parole at the time of the alleged association." Probationer's Post–Hearing Memorandum and Request for Findings of Fact and Rulings of Law at 21. Because the probationer has himself identified Meyers as a co-participant in the criminal activity for which Flynn is on probation, *see* Information at 9, the court is unconvinced by the probationer's implication that Meyers is not within the class of individuals referred to in Condition No. 2.

Based on the evidence before it, the court finds and rules that Flynn violated Condition No. 2 of his probation by associating with James Meyers.

*4. Revocation*

Considering that Flynn is on probation for, inter alia, having "devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of false and fraudulent pretenses, representation and promises," Information at 9, the court finds and rules that each of the violations of the conditions of probation found hereinabove is sufficient to warrant revocation of probation on the ground that "confinement is necessary to protect the public from further criminal activity" by this individual. *See* Notes of the Advisory Committee on Rule 32.1, Federal Rules of Criminal Procedure (quoting American Bar Association, Standards Relating to Probation § 5.1 (Approved Draft, 1970)). Notwithstanding the foregoing, the court finds and rules that as to each of these violations, considering the offenses for which Flynn is on probation, "it would unduly depreciate the seriousness of said violations if probation were not revoked." *See id.*

Accordingly, the court herewith revokes probation. A sentencing hearing will be scheduled as soon as the court's calendar permits.

SO ORDERED.